OLNEY H. RICHMOND, ADMINISTRATOR OF THE ESTATE OF CADY W. SHERWOOD, DECEASED, v. THE CHICAGO & WEST MICHIGAN RAILWAY COMPANY.

*Railroad companies—Accident at crossing—Absence of flagman— Contributory negligence—Damages.*

1. Plaintiff's intestate, a street-car driver, was killed at a railroad crossing by a collision with nine detached freight cars, running at the rate of from 8 to 10 miles per hour, without any warning of their approach other than the noise made in running. The flagman was not at his usual post of duty, and gave no warning of danger until the horse was upon the crossing. After leaving another railroad crossing, about 185 feet from the one where the accident occurred, the driver could not have seen the approaching freight cars until within about 20 feet of the crossing where he was killed, and he did not look in the direction from which the cars were approaching, after reaching said point, until his horse was upon the track. And it is held that the question of his negligence (that of the defendant being apparent) was for the jury, who were to determine whether, under the circumstances, the driver had the right to rely, and how far, upon the absence of the flagman from his post of duty, and the want of any signal of danger from him, as an assurance of safety; and, if they found that an ordinarily prudent man would have acted as the driver did, the plaintiff could recover.

2. In an action against a railroad company under How. Stat. §§ 3391, 3392, for the negligent killing of the plaintiff's intestate, the damages recoverable are limited to the pecuniary injury sustained by the persons entitled to share in the distribution

of his personal estate (*Van Brunt v. Railroad Co.*, 78 Mich. 530; *Hurst v. City Railway*, 84 Id. 539); which distribution is governed by the statute existing at the time of the death of the intestate.

3. The following general propositions are summarized from the majority opinion of Mr. Justice MORSE:

*a*—It is not the law of this State that, under all circumstances, it is absolutely necessary for a person approaching a railroad crossing to look both ways and to listen for approaching trains; citing *Cooper v. Railway Co.*, 66 Mich. 266.

*b*—A traveler is not compelled, under all circumstances, to stop before crossing the track, if his view is obstructed from one way. He is required to take such precaution as an ordinarily prudent man would under like circumstances, and whether he did use such care is generally a question for the jury; citing *Guggenheim v. Railway Co.*, 66 Mich. 157, 158.

Error to superior court of Grand Rapids. (Burlingame, J.) Argued October 24, 1890, and reargued May 20 and 21, 1891. Decided July 28, 1891.

Negligence case. Defendant brings error. Affirmed. The facts are stated in the opinion.

*Smith, Nims, Hoyt & Erwin (M. J. Smiley,* of counsel), for appellant, contended:

1. The family to whose support Sherwood contributed in his lifetime consisted of his mother, two sisters, a brother, and himself. At the time of the trial one of the sisters was supporting herself, and the brother was supporting himself and contributing to the maintenance of the family. What, if anything, the younger sister was able to do towards her own support, or for what period, or to what extent she is likely to require aid in the future, was not shown; hence the testimony showing the amount of Sherwood's contribution could not furnish any proper measure of damages; citing *Railway Co. v. Bayfield*, 37 Mich. 205; *Cooper v. Railway Co.*, 66 Id. 261; *Balch v. Railroad Co.*, 67 Id. 396; *Van Brunt v. Railroad Co.*, 78 Id. 530; *Hunn v. Railroad Co.*, Id. 513.

2. The action of the trial judge in refusing defendant's requests, and in charging the jury in accordance with the instructions to which errors are assigned, was directly in conflict with the well-established law in this State, that "the track itself is a

warning of danger to those who go upon it, and persons
about to cross a railroad track are bound to recognize the
danger, and to make use of the sense of hearing as well as of
sight; and, if either cannot be rendered available, the obliga-
tion to use the other is the stronger, to ascertain, before
attempting to cross it, whether a train is in dangerous prox-
imity; and if they neglect to do this, but venture blindly or
carelessly upon the track, without any effort to ascertain
whether a train is approaching, it must be at their own risk.
Such conduct is of itself negligence;" citing *Mynning v. Rail-
road Co.*, 59 Mich. 260, 64 Id. 101; *Greenwood v. Railroad
Co.*, 124 Penn. St. 572; *Allen v. Railroad Co.*, 19 Atl. Rep.
105.

3. One approaching a railroad track with the intention of crossing
should look in both directions, and listen, to ascertain whether
a train is coming; citing *Railroad Co. v. Thompson*, 62 Ala.
494; *Railroad Co. v. Bell*, 70 Ill. 102; *Railroad Co. v. Byam*,
80 Id. 528; *Railway Co. v. Mathias*, 50 Ind. 65; *Laverenz v.
Railroad Co.*, 56 Iowa, 689; *Butterfield v. Railroad Co.*, 10
Allen, 532; *Tully v. Railroad Co.*, 134 Mass. 499; *Abbett v.
Railway Co.*, 30 Minn. 482; *Railroad Co. v. Mitchell*, 52 Miss.
808; *Fletcher v. Railroad Co.*, 64 Mo. 484; *Powell v. Railroad
Co.*, 76 Id. 80; *Cordell v. Railroad Co.*, 75 N. Y. 330; *Pennsyl-
vania Co. v. Rathgeb*, 32 Ohio St. 66; *Railroad Co. v. Whit-
acre*, 35 Id. 627.

4. If a person is not required to look upon a railroad track before
attempting to cross it, there is no available precaution which
the law can exact of a man of sound mind for his own pres-
ervation; citing *Railroad Co. v. Van Steinburg*, 17 Mich. 127.

*J. M. Jamison* (*Montgomery & Bundy*, of counsel), for
plaintiff, contended for the doctrine of the opinion.

MORSE, J. The plaintiff's intestate was the driver of
a street-railway car in the city of Grand Rapids, and on
the 23d day of April, 1889, while driving his car on
West Fulton street, in said city, was killed by a collision
with a train of the defendant company at the street
crossing. This is an action for damages on account of
his death. Plaintiff recovered judgment in the Kent cir-
cuit court in the sum of $5,313. At the close of plaint-
iff's proofs, the defendant demurred to the evidence, and

asked that a verdict be directed in its favor, on the ground that the plaintiff's intestate was not in the exercise of due care and caution when the accident occurred, and was therefore guilty of contributory negligence. This motion was denied, and the defendant thereupon put in proofs. This action of the trial court and other errors are alleged as reasons for the reversal of this judgment.

We will first examine the question whether the court erred in permitting the plaintiff to go to the jury as to his intestate's negligence. This must be decided, as is admitted by defendant's counsel, upon the case as made by the testimony on the part of the plaintiff, which case is substantially as follows:

Between the hours of 4 and 5 in the afternoon of April 23, 1889, Sherwood, with his car drawn by one horse, came down West Fulton street, approaching defendant's track. West Fulton street runs nearly east and west, and the railroad track crosses it nearly at right angles. Sherwood was going east. About 185 feet west of the defendant's track is another railroad crossing, that of the Lake Shore & Michigan Southern Railway. Sherwood was observed crossing this latter track on a walk. Beyond that to the east it is down grade, and he then started his horse on a trot, and continued until within 25 or 30 feet of defendant's crossing, when he "slowed down" to a walk. At this crossing, on the north side of West Fulton street and the west side of the railroad track, is a shanty used for a flagman, who was stationed there to give warning of the approach of trains to the passers-by. To the north the view of the track was comparatively unobstructed, but upon the south side of the street, and to the west of the railroad track, were situated a lumber-yard, lumber office, coal-shed, lumber-sheds, and piles of lumber and posts, more or less obstructing the view of cars coming from the south. On the day in question there was at least one car loaded with lumber upon a side track in the lumber-yard, which added to the obstructions.

The witnesses who testified to seeing Sherwood approach

the track did not all see him in the same place; some did not notice him until he was within 25 or 30 feet of the track, and others not until he was right upon it. Others saw him as he crossed the Lake Shore & Michigan Southern track, and until he was injured, except such times as they were looking at the cars. They do not agree as to what he was doing, except that he was on a walk within 25 or 30 feet of the track, and had hold of the lines, and some say one hand on the brake, and was standing in his usual place upon the front platform of his car. Some did not notice where he was looking. One witness says he looked straight ahead all the while, as if he was looking at the horse; others, that he looked to the north all the time, and towards the watchman's shanty. One witness, and the only one who so testifies, says that he saw Sherwood's head go both ways. He first observed him 40 or 50 feet back of the track.

Just as Sherwood got to the track a train of nine cars, detached from the engine, came down the track from the south. "Sherwood then stopped, put his hand on the brake, tried to 'brake up,' but could not. The horse was on the track, his forward feet across it. The horse gave a jerk, and pulled Sherwood over the dash-board, and under the car." Sherwood died of the injuries there received. These cars were running, as testified by plaintiff's witnesses, at the rate of from 8 to 12 miles an hour, the majority estimating the speed at from 8 to 10 miles an hour. There was no warning of the approach of these cars, except the noise they made in running. There was no lookout on the forward car. There was a man standing on the third car from the front of the train, but he was looking north-east, and giving no attention to the crossing. The flagman was not at his usual post of duty, and no signal or warning was given by him until the horse was on the track. He then ran out of the shanty or flag-house in his shirt sleeves, and bare-headed, but too late to warn Sherwood of his danger.

The plaintiff's claim was that the defendant was negligent in the following particulars:

1. That the cars were run at too high rate of speed, in violation of the city ordinance,—a speed which also, in view of the nature, locality, and surroundings, was, as a matter of fact, dangerous and negligent.

2. That no proper signals were given to warn those approaching the crossing, and particularly the deceased, of the approach of the train.

3. That the flagman was absent from his post of duty, which was outside of the flag-house, with his flag to give warning (but was present in the flag-house, in view of the deceased), and failed to give any warning of the approach of the train.

The negligence of the defendant is apparent from the evidence on the part of the plaintiff, and need not be discussed further.

It is contended by the defendant's counsel that the plaintiff's intestate was guilty of negligence as a matter of law; that there were places on the line of Sherwood's course before he reached the track where he could have seen these cars approaching, had he looked to the south; that, at a point 40 feet west of the railway crossing, the cars could have been seen before the lumber office obstructed the view; that a hundred feet of the track was visible by looking through between the office and the lumber-piles; also that, at a point 25 feet from the crossing, a car could be seen 74 feet south of the crossing, and from a point 16 feet west of the crossing a car could be seen approaching from the south 167 feet south of the crossing,—the street-car track being in the center of the highway. We do not think from the testimony produced by the plaintiff that Sherwood could have seen the cars approaching from the south, after he left the crossing of the Lake Shore & Michigan Southern Railway, until he came within about 20 feet of the crossing. If he had looked then, he would have undoubtedly seen these cars in time to have stopped and avoided a collision. And it is pretty apparent—almost absolutely certain, from the plaintiff's own showing—that he did not look south within said 20 feet, until his horse was upon the track.

Whether he was negligent depends in a great measure

upon whether or not he had a right to rely, under the circumstances, upon the absence of the flagman, and the lack of any signal of danger from him.

It is claimed by defendant's counsel that the obstruction of the view to the south, and the absence of the watchman from his post, called upon Sherwood to have stopped, and looked and listened, before he attempted to pass this crossing. This claim would be correct if, at this street crossing, no flagman had been stationed to give warning. But the testimony shows that a flagman had been kept at this point for three or four years, whose duty it was to signal by a flag in the street the approach of trains. It is not the law of this State that, under all circumstances, it is absolutely necessary for a person approaching a railroad crossing to look both ways and to listen for approaching trains. It is generally required, but it is not a rule of universal application. Every case must depend upon its own circumstances, and it would be unreasonable to apply such rule, under all circumstances, without regard to the condition of things at the time. *Cooper v. Railway Co.*, 66 Mich. 266. Nor is a traveler compelled, under all circumstances, to stop before crossing, if his view is obstructed from one way. He is only required to take such precaution as an ordinarily prudent man would under like circumstances, and whether or not he did use such care is generally a question for the jury. See *Guggenheim v. Railway Co.*, 66 Mich. 157, 158, and cases cited.

Plaintiff's counsel contend that, it appearing that the defendant had stationed a flagman at this crossing, whose duty it was to warn parties about to cross of approaching trains, it was for the jury to say whether the deceased, in keeping his eyes directed to the flagman for the very purpose of observing a signal at the earliest moment that it could be given, was not exercising due care. They cite

the following cases in support of this contention: *French v. Railroad*, 116 Mass. 537; *Sweeny v. Railroad Co.*, 10 Allen, 377; *Railroad Co. v. Hutchinson*, 120 Ill. 592 (11 N. E. Rep. 856); *Pennsylvania Co. v. Stegemeier*, 118 Ind. 305 (20 N. E. Rep. 843); *Glushing v. Sharp*, 96 N. Y. 676; *Railway Co. v. Schneider*, 45 Ohio St. 678 (17 N. E. Rep. 321); *State v. Railroad Co.*, 80 Me. 444 (15 Atl. Rep. 39); *Central Trust Co. v. Railway Co.*, 27 Fed. Rep. 159: *Tyler v. Railroad Co.*, 137 Mass. 238; *Railway Co. v. Yundt*, 78 Ind. 373.

In *French v. Railroad*, 116 Mass. 537, the submitting of the question of contributory negligence to the jury was not affirmed upon the ground of the absence of the watchman alone, but in connection with the further fact that a train had just passed, and plaintiff did not suppose, or have reason to suppose, that another would follow so closely as it did, the cars doing the injury having been cut off from another train, and "shunted" down the track.

In *Sweeny v. Railroad Co.*, 10 Allen, 377, the flagman signaled the traveler to come on, and he went upon the track, relying upon such invitation. It was said by the court:

"No express invitation need have been shown. It would only have been necessary for the plaintiff to prove that the agent did some act to indicate that there was no risk of accident in attempting to pass over the crossing."

In *Railway Co. v. Yundt*, 78 Ind. 376, the court say:

"If the defendant had, for a considerable time before the accident, kept a flagman at the crossing to give signals on the approach of trains, and if the plaintiffs had been in the habit of crossing the railroad at that place, and observing the signals, and if, on the occasion of the accident, no signal was given, the plaintiffs not knowing that the services of the flagman had been dispensed with, these facts might, in our opinion, be considered by the jury, in connection with all the other circumstances, in

determining whether or not the plaintiffs were free from contributory negligence."

It is also said in *Railroad Co. v. Hutchinson*, 120 Ill. 592:

"We are aware of expressions by this court, when passing upon the law and fact, and of like expressions by other courts of the highest respectability, that the failure of one approaching a railroad crossing to pause and look for the approach of trains was such negligence as would, in the case then under consideration, preclude a recovery. But we are not prepared to say, as a matter of law, that a person approaching a railroad crossing, where there is nothing apparent to warn him of danger, and at which he knows a flagman is stationed, whose known duty it is to warn all persons of danger from running trains, is required to look elsewhere than to the flagman. The flagman's duty is to know of the approach of trains, and to give timely warning to all persons attempting to cross the railroad track, and the public have a right to rely upon a reasonable performance of that duty. * * * It may be that in the particular case a reasonably prudent and careful man would do more than observe the absence of the ordinary signal by the flagman; but, if so, the facts and circumstances should be submitted to the jury, to be considered by them in determining whether the party had, under all the circumstances, exercised ordinary care and caution to prevent injury."

In *Glushing v. Sharp*, 96 N. Y. 676, and in *Railway Co. v. Schneider*, 45 Ohio St. 678, there were gates at the crossings, attended by a gateman, which gates were closed when there was danger of an approaching train, and open when there was no such danger. In both these cases, the gates being open, the persons injured drove in upon the track upon the assumption that there was no danger. Held, that such persons had the right to presume, in the absence of knowledge to the contrary, that the gatemen were properly discharging their duties; and that it was not negligent on their part to act on the presumption that they were not exposed to a danger which could only arise from a disregard of their duties by the gatemen.

The following cases tend to support the plaintiff's contention that the question of Sherwood's negligence was for the jury: *Tyler v. Railroad Co.*, 137 Mass. 238; *Railway Co. v. Clough* (Ill.), 25 N. E. Rep. 664; *Pennsylvania Co. v. Stegemeier*, 118 Ind. 305; *Central Trust Co. v. Railway Co.*, 27 Fed. Rep. 159; *State v. Railroad Co.*, 80 Me. 430, 444; *Burns v. Rolling Mill Co.*, 65 Wis. 312, 315 (27 N. W. Rep. 43). See, also, Shear. & R. Neg. § 466.

On the contrary, we are cited to a case in Pennsylvania (*Greenwood v. Railroad Co.*, 124 Penn. St. 572, 17 Atl. Rep. 188) where gates and a watchman had been kept at a crossing. The gates were lowered at the approach of trains. The gates were out of repair. Being open, the plaintiff drove a hose-cart across the track without stopping or looking or listening. The watchman displayed no signal and gave no warning. The court held this to be contributory negligence on his part, and said, speaking through the chief justice:

"I do not understand the law to be that, when a railroad company adopts safety-gates or any other appliance for the protection of the public, the public are thereby absolved from the duty of taking any care of themselves. * * * The plaintiff was bound to do his part. He has no right to omit the ordinary precautions when approaching a railroad crossing merely because he finds the gates up. Each party should be held to the exercise of due care. * * * If the rule to stop, look, and listen were always observed, an accident at crossings, now so frequent, could rarely occur, whether in town or country. It is as important in towns as in the country. It is sustained by such abundant authority, and founded on such excellent common-sense reasons, that we will neither depart from it, nor allow it to be undermined by exceptions. It is a clear and certain rule of duty, and a departure from it is more than evidence of negligence; it is negligence *per se*."

The evidence on the part of the plaintiff tended to

show that the watchman was inside the shanty or flag-house. The door of this house opens on the east, facing the railroad track. There are two small windows in it, one in the north and one in the south end, so that the flagman can see up and down the track both ways. It is claimed by the plaintiff that Sherwood was looking towards this south window, and could see the flagman therein before he reached the track, while the defendant claims that he could not have seen him until his horse was on the track. Of course, if Sherwood saw the watchman inside of his house, where such flagman could plainly see an approaching train, and the flagman gave no signal, it would be a more favorable circumstance to plaintiff, as bearing upon Sherwood's negligence, than if the flagman was apparently absent from his post, and Sherwood could not see him at all. The only evidence as to whether Sherwood could have seen the flagman through this window comes from two witnesses. Gilman, for the plaintiff, says:

"The windows on the north and south sides of the shanty are well towards the east, and near the two corners. They are small windows. A person coming from the west, driving a street-car, could not see through those windows, to see who was in the shanty, until he got opposite. When they got opposite they would be right up by the track."

Rooney, for the defendant, says:

"The driver could have seen him [the watchman], if he was watching carefully for him, through the window that fronts Fulton street."

Under all the circumstances, I am satisfied that the court correctly submitted the question of Sherwood's negligence to the jury. He instructed them that—

"A railroad crossing is a place of danger, and is itself a warning to any one about to go upon it to be careful and vigilant to the extent of his opportunities. It was

the duty of Sherwood in approaching the railroad track to use his senses of sight and hearing to ascertain whether a train was approaching, and, if the jury find that he did not, then the plaintiff is not entitled to recover."

The jury were further instructed that it was the duty of Sherwood to exercise due care whether or not the flagman was in sight, and, if the flagman was found not to have been present to give warning, such fact could be considered as bearing upon the negligence of both Sherwood and the defendant.

The jury were further instructed as follows:

"If the deceased, Sherwood, by the exercise of ordinary care and prudence, by looking up the track in the direction of the approaching train, could have seen it in time to avoid the injury, his omission to do so would amount to such negligence as would defeat plaintiff's right of action, unless you find that his attention at the time was directed to the flagman and the flag-office, and that he had a right to rely on the position of the flagman, and absence of warning, as an assurance of safety. If the jury find the view of the track approaching from the south was obscured somewhat by lumber, etc., in Pierce's lumber-yard, so that a train could only be observed by extreme care and caution, and that Sherwood knew this, then it was the duty of Sherwood to use such extreme care and caution as was appropriate to the circumstances. This would be true in a case where there was no flagman; but the question of the extent to which the deceased had a right to rely upon the position of the flagman, and his failure to give warning, is a question for the jury. It is the duty of every car-driver, when approaching a railroad crossing with passengers in his car, where his view of an approaching train is somewhat obscured, to stop, and look and listen, to insure himself that a train is not approaching before he attempts to cross, unless the negligence of the duty of the company, through the absence of its flagman or his failure to give warning, was such a notice to Sherwood that it was safe to cross as would excuse an ordinarily prudent man from stopping, and looking and listening. * * * *

87 MICH.—25.

" It was the duty of Sherwood, in approaching such crossing, to have his horse and car under control, so that he could respond quickly to the slightest intimation of danger; and if he approached the track after he received such intimation, or was negligent in looking or listening for such intimation, and thus contributed to the injury, then the plaintiff cannot recover."

"If the jury find that a person of ordinary care, driving the street-car, as Sherwood was, might, by exercising proper care and diligence, have ascertained that the cars were approaching from the south at the time of this accident, then the plaintiff cannot recover in this case, however negligent the railroad company ·may have been, and although the flagman was not at his post of duty to give warning.        *        *        *        *        *        *

"If the railroad company was negligent, and the flagman was negligent, and Sherwood was also so negligent as to in any· manner contribute to the injury, then the plaintiff could not recover."

" To entitle the plaintiff to recover, he must establish that the death of Sherwood was caused by the negligence of the defendant. This, of course, requires a showing that Sherwood was not himself guilty of negligence which contributed to the injury. To constitute negligence contributing to the injury on the part of Sherwood, there must have been a failure on his part to observe and exercise ordinary care; and, if the plaintiff has shown that the deceased, Sherwood, used such care as men of ordinary prudence would have exercised under like circumstances, and placed as he was, then he was not guilty of contributory negligence.

" In determining whether the deceased, Sherwood, used due care, you have the right to take into account the obstructions to the south, their nature and extent, the manner in which Sherwood was driving, the fact of the defendant having maintained a flagman at the crossing, and the fact, if it be a fact, that this was known to Sherwood; and you have a right to take into account whether the deceased was watching for the flagman, the extent to which he had his car under control, the extent to which he looked out for trains; and you are then to say whether he used such care as men of ordinary prudence would have exercised under like circumstances,

and, if he did use such care, he was not guilty of contributory negligence."

The defendant asked the court to instruct the jury, in substance, that the absence of the flagman from his post did not in the least excuse Sherwood from exercising his senses of sight and hearing to ascertain whether the train was approaching; and that, if the deceased, Sherwood, by looking up the track in the direction of the approaching train, could have seen it in time to avoid the injury, his omission to do so was such negligence as would prevent plaintiff's recovery. This was refused, and it will be seen that the court left it to the jury to determine whether, under the circumstances, Sherwood had a right to rely, and how far, upon the absence of the flagman from his post of duty, and the want of any signal of danger from such watchman, as an assurance of safety; and they were instructed that, if an ordinarily prudent man would have done the same as Sherwood did under the same circumstances, the plaintiff could recover.

I find no errors in the charge on the subject of negligence.

There were no material errors in receiving or rejecting testimony.

It is alleged that the court erred in his instructions as to damages. The evidence showed that the next of kin of the deceased consisted of his mother, Fannie Sherwood, two brothers, Seth W. and Frank Sherwood, and two sisters, Ella and Marcella Sherwood. The deceased lived with his mother, as did his sister Ella, who was an invalid. Frank lived with his mother. The older son, Seth, had not been heard from in five years, at which time he was in Wisconsin. Mrs. Sherwood testified that deceased helped her from eight to ten dollars per week. He also assisted her in her work about the house when

he was off duty as car-driver. He was 30 years of age at
the time of his death. She testified that his board, allow-
ing him for his help about the house, was worth about $2
per week. Frank worked at a restaurant for $1 a day,
and contributed some to the support of the family.
Since the death of Cady, the deceased, Frank has con-
tributed nearly his entire wages to the support of the
family; before that about $2 per week. The oldest
daughter, Marcella, boarded and lodged at home, but con-
tributed nothing to the support of the family. The
mother testified that the deceased contributed $2 per
week towards the support of his invalid sister, Ella.
Ella was 21 and Mrs. Sherwood 54 years of age when
Cady died. The court instructed the jury as follows:

"If you find the plaintiff entitled to recover, he is
entitled to recover damages to the extent of the pecuniary
loss which the mother and next of kin of the deceased,
Mr. Sherwood, have sustained by his death. This amount
will be such an amount as the jury are able to say it is
reasonably probable would have been contributed by the
deceased to their support had he lived. The jury cannot
go beyond the term of the expectancy of life of the
deceased, which is shown by the tables to have been
35.33 years, and, in weighing the testimony as to the
contributions which would have been likely to have been
made to the mother of the deceased, the jury cannot
extend these beyond the period of her expectancy of
life, which is shown by the tables to have been 18.79
years. As to the testimony of contributions to the sister,
these cannot be considered, except for the period after
the probable decease of the mother, and, under the testi-
mony, such contributions are said to have been included
in the sum which was contributed to the family. It is
not for the court to intimate what amount of contribu-
tions the deceased would have contributed to the family,
nor is the evidence of what he had in his life-time con-
tributed conclusive upon this subject, but it is evidence
which the jury have a right to consider for what it is
reasonably worth, and it is for the jury to say what it is
reasonably probable that the deceased would have con-

tributed, both as to the extent and duration thereof, not exceeding the time stated as his expectancy of life, and not exceeding the amount shown to have been contributed in his life-time; and, if you are able to fix the sum which he would have annually contributed, then I charge you that the plaintiff should recover only the present worth of that sum, as you may find it to be, not exceeding in amount ten thousand dollars, the amount stated in the declaration."

The statutes giving damages in cases like the present are as follows:

How. Stat. § 3391. "Whenever the death of a person shall be caused by wrongful act, neglect, or default of any railroad company or its agents, and the act, neglect, or default is such as would (if death had not ensued) entitle the party injured to maintain an action, and recover damages in respect thereof, then, and in every such case, the railroad corporation which would have been liable if death had not ensued shall be liable to an action on the case for damages, notwithstanding the death of the person so injured, and although the death shall have been caused under such circumstances as amount in law to felony.

"Sec. 3392. Every such action shall be brought by and in the names of the personal representatives of such deceased person, and the amount recovered in any such action shall be distributed to the persons and in the proportion provided by law in relation to the distribution of personal property left by persons dying intestate; and in every such action the jury may give such amount of damages as they shall deem fair and just to the persons who may be entitled to such damages when recovered: *Provided,* nothing herein contained shall affect any suit or proceedings heretofore commenced, and now pending in any of the courts of this State."

We held in *Van Brunt v. Railroad Co.,* 78 Mich. 530, that, under these statutes, none of the next of kin could recover unless they showed a pecuniary injury on account of the person killed, and if, as in that case, the proofs showed no person percuniarily injured by the death of plaintiff's intestate, there could be no recovery; that it

evidently was not the intention of the Legislature to make one rule of damages in the case of a person killed through the negligence of a railroad company, and another rule in the case of a person killed by some person or corporation other than a railroad company. Under this holding, damages in this case could only be recovered on account of the mother, and the sister Ella, as no pecuniary injury was shown to the others by Sherwood's death. The court, in effect, so limited it, and was also correct in allowing no damages to be computed on account of the sister until after the mother's death, as, under the testimony, these contributions to the sister were included in the contributions to the family.

It is urged that the court erred in allowing the recovery of any damages on account of the sister Ella, because under the law of distribution of the personal property of intestates passed in 1889, and which was in force at the time the verdict was rendered, the whole of the personal estate of the son descended to the mother, and she would therefore be entitled to the whole of the damages. Act No. 168, Laws of 1889 (3 How. Stat. § 5772 a). But the distribution of the personal property of Sherwood's estate would, we think, be governed by the law in reference thereto existing at the time of his death, which provided that the property in such a case as this should descend, one-half to his mother, and the remainder in equal shares to his brothers and sisters. Act No. 169, Laws of 1883. See, also, How. Stat. § 5847, subd. 6.

The counsel for defendant argue, further, that, if the personal estate descends under the law of 1883, section 3392 of Howell is invalid and inapplicable, because, by the latter statute, the jury are authorized to give such amount of damages as they deem fair and just to the persons who may be entitled to such damages when recovered; and this has been construed to mean that the jury

may give such damages as have been sustained by the
several persons who have suffered pecuniary loss. But, as
the same statute also provides that the money so recov-
ered shall be distributed to the persons and in the pro-
portion provided by law in relation to the distribution of
personal property left by persons dying intestate, it is
argued that the brothers and sisters are all put upon the
same footing, whether any damages have been recovered
on their account or not; and that in this case, if the
other sister and the brothers should apply to the probate
court for their share, such court could not refuse to
order it turned over to them. They would thereby receive
money, in effect, for damages which the statute would
not permit to be recovered on their account, because they
had suffered no pecuniary loss by their brother's death.

There is a seeming contradiction or inconsistency in
this statute under the construction given it in *Van Brunt
v. Railroad Co.*, 78 Mich. 530, but, as so construed, it is
identical in its provisions with section 8314, How. Stat.,[1]
under which statute damages have been recovered, and
affirmed by this Court, in a number of cases. And in
*Hunn v. Railroad Co.*, 78 Mich. 513, the assessment was
affirmed as proper of nominal damages only to the brother
and sisters of Hunn, who were entitled to a share with
the widow of the personal estate of the deceased under
our laws of distribution of personal property.

The same objection, with more elaboration, was made
to a statute of New York, similar to ours, by Hoar, J.,
in *Richardson v. Railroad Co.*, 98 Mass. 85, 90, 91, but
the case was not, however, decided upon that ground.

What disposition is made of the money recovered, if
the defendant is liable for it, for pecuniary damage suf-
fered by any of the next of kin through its negligence,

---

[1] For a construction of this section, see *Hurst v. Detroit City Ry.*,
84 Mich. 539.

does not concern the defendant. When a conflict arises under this statute as to the distribution of the money recovered as damages, it will then be competent and necessary for the courts to decide who are entitled to the fund. The damages are manifestly to be given in reference to the pecuniary injury resulting from the death to those persons who may be entitled to such damages when recovered. See section 8314, IIow. Stat.; *Van Brunt v. Railroad Co.*, 78 Mich. 530. It would seem that in this case the damages should have been given, as they were under the charge of the court, in reference to the pecuniary injury suffered by the mother and the sister Ella, and there also would seem to be no serious difficulty in the way of their obtaining the amount from the administrator.

It is claimed that the verdict was excessive. With that we have nothing to do. But if the jury found that Sherwood contributed $7 a week to his mother, and $2 per week to his sister, as they were warranted in doing from the proofs, considering the expectancy of life of the mother and son, the verdict cannot be said to have been excessive.

The judgment is affirmed, with costs.

McGRATH and LONG, JJ., concurred with MORSE, J.

CHAMPLIN, C. J. (*dissenting*). I think the judgment in this case should be reversed.

What the law requires of all parties is due caution to avoid negligently injuring another, and it requires the same care or caution to avoid being injured by the negligence of another. This care or caution or precaution is not measured by the care that people generally or ordinarily observe respecting themselves and their affairs, but it is measured by the occasion and the circumstances under which the danger or injury is threatened, and calls upon

persons placed in a position known to be dangerous to exercise active diligence and foresight to avoid it; and the test is not what an ordinarily prudent person would do, but is, what *should* a prudent person do under the circumstances?

To say that a person is excused from exercising due and proper care to avoid injury or accident, if he does as people ordinarily do, without distinguishing between careless people and prudent people, is to lay down a rule that carelessness is ordinary prudence or caution. It is an ordinary trait of character for most people, old and young, daily to take risks involving danger of injury to their persons. It is a natural trait of young people, before they have arrived at an age when deliberation succeeds to impulse, and out of the experience of their lives in suffering from undue haste have learned to be cautious, to take risks and hazard their personal safety. It takes some a longer time than others to learn these lessons of prudence, and some never learn them; and, if a thousand heedless persons rush into danger, there is no reason why one such heedless person, who, taking the chances, receives an injury, should be allowed to recover because a thousand neglected to exercise prudence. The question is not what others would do or might have done, but it is, did he exercise prudence and due care to avoid the injury, under the circumstances by which he was surrounded?

Plaintiff's intestate was in a position to know the danger encountered at that crossing. The law and common sense required him to exercise prudence in approaching it,—that is, not to rush upon it at an immoderate rate of speed; and it called upon him to use that precaution to avoid being run upon and injured which the circumstances and surroundings permitted him to exercise

by looking for himself up and down the track to see if a train was approaching.

I do not think the deceased was excused from exercising his faculties of sight and hearing by the fact that a watchman had been employed at the crossing, and the further fact that the watchman was not in his sight. He had no right to presume when the watchman was absent that he could safely cross the track. It might have been different if he had seen the watchman at his station, and he gave him no intimation that there was any danger to be apprehended in crossing.

GRANT, J. (*dissenting*). West Fulton street, in the city of Grand Rapids, runs nearly east and west, and crosses the defendant's road nearly at right angles. Plaintiff's decedent was a street-car driver, and was driving east on this street. About 185 feet west he had crossed the track of the Lake Shore & Michigan Southern Railway. He crossed that track upon a walk, after which he started his horse upon a trot, and, when within from 25 to 30 feet of the defendant's road, he had "slowed down" to a walk. He continued at this pace until he was upon the defendant's track, when he was struck by some cars, passing over defendant's road to the north, and was killed. Plaintiff recovered verdict and judgment in the court below, and defendant appeals.

A flagman had been stationed at this crossing for about four years. It is claimed by the plaintiff that this flagman was not at this time at his post of duty, giving the customary signals of an approaching train. Defendant requested the court to direct a verdict for the defendant, on the ground that plaintiff's decedent was guilty of contributory negligence.

It is evident that Mr. Sherwood, when within 25 feet of the center of the crossing, could have seen the cars

approaching from the south, at a distance of 74 feet from the crossing. When within 16 feet he could have seen them 167 feet distant, and when within 12 feet he could have seen them full 300 feet distant. He did not look in that direction, nor stop his car to look or listen, but drove steadily along until his horse was upon the track, and the front end of his car projected over the track, when they were struck by the approaching cars. It was down grade at this point of the defendant's road. Defendant's employés were doing what is commonly called a "kick." The cars were set in motion, and a brakeman left on to stop them. These cars were to be stopped just north of Fulton street, and left until defendant got through with switching at another point. It is evident that the deceased did nothing to inform himself as to whether or not a train was approaching, except it were to look for the flagman and a signal from him.

The theory of the plaintiff is that the deceased was looking to the flagman's shanty, within which it is claimed the flagman was at the time, and that he had the right to rely and act upon the absence of the flagman as a notice that no train was approaching, and that it was a question for the jury to determine whether or not he was guilty of contributory negligence. The following is all the testimony given by the plaintiff in regard to the conduct of the deceased: Benjamin Hall testified:

" From the time I first saw the driver, which was when he was about half-way between the Lake Shore and the Chicago & West Michigan tracks, I watched him all the while until the accident occurred. I couldn't say as to how he was looking. I don't know. He continued to walk down. The horse walked all the way until it got on the track. I couldn't tell whether he was looking to the right or to the left."

Joseph E. Quigley testified:

" I observed the driver just as he was half-way between

the lumber office and Pickell's office, in the coal-yard, about twice the length of a street-car from the railroad track. He was standing facing his horse with his right hand on the brake, and the lines in his left hand, looking straight,—looking, as I should think, at the horse more than anything else,—looking ahead. I cannot state whether or not he looked to the north or south. He was driving at a walk."

Witness further said that when he saw the railroad train he thought it was 138 feet south from Pierce's office, and he should judge that the street-car was then 40 feet from the railroad track.

Byron R. Wheeden testified that he saw the car, but not the driver, when just a little ways west of the West Michigan track, and the horse was on a walk.

Frederick E. Parks testified:

" I observed the driver of the street-car 40 or 50 feet back of the track. He was driving with his right hand on the brake, and his left on the lines. He came down to a walk about 30 feet from the track, as near as I judged. I saw his head go both ways. He looked straight ahead again from that on. He neither looked to the right nor left till he got pretty close to the track."

David F. Cogswell testified that he saw Sherwood back almost to the Lake Shore crossing; that he was then driving between a trot and a walk; that as he neared the West Michigan crossing he was driving slow; that about 30 feet from the track he drove behind the flagman's station, so that witness could not see him again till he came out from behind the building; and that when he again came in sight he could not say whether he was on a walk or not.

David Forbes testified that his attention was first attracted to the situation by the blowing of the whistle; that he then saw the street-car driver going east; that after he got off the Lake Shore road he started on a

pretty good jog, but slowed up as he went on, and was very near on a walk when he got to the track.

This testimony affords no foundation for the claim that he was looking specially at the flagman's station to see if he was within. He could not look within it until he was opposite thereto, and very close to the track.

The deceased's occupation, in which he had been employed for some time, took him over this track many times every day. He was perfectly familiar with the situation. He knew that switching was liable to be done there at any time, and that it was usually done about the time of day that this accident occurred. Some of the witnesses for the plaintiff, standing a considerable distance away, heard the whistle, saw the approaching train, and recognized the danger which the deceased was approaching. So, also, did some of the witnesses for the defendant, one of whom testifies to halloing to the driver, and warning him of the danger.

Under this state of facts, I am unable to see how rea_ onable minds can differ as to the conclusion to be drawn therefrom. A glance to the south would have disclosed to the deceased the approaching cars in season for him to stop, just as surely as a glance would have disclosed to him the absence of the flagman. The one conclusion, therefore, is that he was taking no precautions whatever in his approach to this most dangerous place. If there had been no flagman stationed at the crossing, he would, under all the authorities, have been guilty of contributory negligence. Therefore the question is clearly presented by this record, did the absence of the flagman release him from taking any precautions to determine whether or not a train was approaching? He had the lives, safety, and property of others under his charge and control. It is the universal and reasonable rule that in all such places one must always be in the exercise of

due care, to protect, not only himself, but those who are temporarily committed to his charge. Certainly a rule that would absolve him from exercising at least ordinary precaution is not founded upon reason or upon humanity. Whatever risks one may see fit to take when he himself is concerned, he certainly should be held to exercise reasonable care when he is taking others, who cannot look out for themselves, into places of danger. Is it a reasonable rule towards the traveling public to hold that a street-car driver may place implicit reliance upon the absence of a flagman, and drive his car with its load of passengers upon the track of a railroad, without any precautions whatever to ascertain whether danger is approaching, and to avoid it? If it is not so far as his passengers are concerned, it certainly is not as to himself. The deceased had no right to transfer the exercise of his own sense of hearing and seeing to another. Even the slightest care on his own part would have avoided the accident, for a glance would have shown him the danger. Being upon a walk, he could, by applying the brake, have stopped his car almost instantly, and within a distance of two or three feet.

The adoption of safety-gates, and the stationing of flagmen at these crossings, are wise additional precautions for the safety of those upon the trains, as well as of those who are crossing upon the streets. But they should not be held to change that reasonable rule requiring care on the part of all who enter upon places of danger. The books furnish many cases where flagmen, and even those in charge of the gates, do not perform their duty, and hence are negligent, which negligence is to be attributed to the railway companies. It would, however, be unreasonable, in my judgment, to permit parties approaching these crossings to assume that these flagmen and gate-keepers will always do their duty. In the

absence of the flagman, I think it was the duty of the deceased to stop and look and listen before driving upon the track. This rule is clear, certain, and reasonable. The exercise of even slight care on the part of those approaching these dangerous places on our public highways would avoid a great majority of the accidents.

At the time this accident occurred a bill was pending in the Legislature, and was passed shortly thereafter, requiring street-car drivers to bring their cars to a full stop before going upon these railway crossings, and to make sure that no engine or cars are approaching, and imposing a fine of $25 for neglect to do so.[1] This statute, in my judgment, but adopted the reasonable rule of the common law. It is well grounded in reason and a wise public policy. It is the only rule which can afford protection to the traveling public. It is not unjust to the traveler who has the control of his own volition, and the power to so easily inform himself and avoid accident. Were it not a reasonable rule, the Legislature would have no right to impose a penalty for its violation.

But plaintiff's counsel strenuously insist that this was a question for the jury. Courts should be very careful not to encroach upon the province of the jury, but, at the same time, they should be equally careful not to abdicate their own functions to the jury. It is the clear duty of the courts to instruct the jury as to the legal effect of undisputed facts, unless different conclusions can be drawn by reasonable minds from such facts. An act which is *per se* negligent is not rendered prudent and careful, within the meaning of the law, by the fact that many do it. So the fact that the street-car drivers were at this time in the habit of driving over this crossing without stopping, or taking other precautions to avoid danger, was incompetent and immaterial, and did not

[1] Act No. 222, Laws of 1889 (3 How. Stat. § 3565c).

relieve the deceased 'from that duty which he owed to himself and to others.

It is but just to the flagman to say that, under the evidence of the defendant, he gave the signal required by law. But, under the evidence of the plaintiff, both he and the deceased were equally guilty of gross negligence. The law imposed a plain duty upon each, which each neglected to perform.

Judgment should be reversed, with costs of this Court, and a new trial ordered.

