Bissell, J.,
delivered the opinion of the court.
The accident by which Carpita met his death killed George Lamb. It is completely detailed in the statement made in *256 the preceding case. We deem it wholly unnecessary to repeat the facts, and regard it as sufficient, for the purposes of this decision, to refer to that opinion, and add such matters as are essential to emphasize the distinction between the two actions, and to make plain what is necessary for an adequate discussion of those things which are essential to the disposition of this controversy. Lamb was a driver, employed to haul coal which had been mined in the various rooms to the mouth of the pit. He was at work when the fall happened. It stopped the moving of the cars, and necessarily suspended his labors until the rock was removed. As soon as the roof fell, the mine boss, Allen, with some other workmen, proceeded to do what was necessary to repair the roof and make it safe. This work involved several things. In the first place the loose rock had to be shoveled away, and the timbers framed and put in place. In the meantime, to guard any possible danger of a subsequent fall, Allen put a prop and a cap at the point where the fall had occurred to sustain the roof while the rock was being taken away and the timbers framed and set up. Lamb, the driver, assisted in the removal of the rock. There is testimony tending to show this was a part of his duty as a driver, although there was no evidence of an order directing him to proceed. This does not seem to be of much consequence, since it was evident the mine boss knew he was at work, and made no objection to his assistance. While he was there assisting in this labor, there was a second fall from the roof, which caught and killed the two men. There is a good deal of conflict in the testimony respecting the condition of the roof at this time, and about the adequacy of the means adopted to hold it while the first fall was being taken away. Were this the only question involved, the verdict of the jury would dispose of it. Other errors have crept into the record, and the case must be examined in some other of its aspects. The complaint is open to the same criticisms which were, in an incidental way, suggested in the preceding case. It is really difficult to determine the theory of the pleader who brought *257 the suit. The bulk of it consists of allegations appropriate to an action under the general damage act, while it contains averments only appropriate to an action based on a violation of the coal mining act. It was not aptly attacked in the court below, for the demurrer was a general one, and no motion was made to strike out the parts which tended to establish the company’s neglect of duty as defined by the act. When the case goes back for another trial, as it must, the complaint should be reformed to state a cause of action under the general act, or to state one under'the coal mining act, as the pleader may be advised. Should he attempt to pursue the course which some authorities indicate, and state a cause of action under both, the question as to the joinder of the two causes of action could be raised in the manner pointed out by the code. We do not intend to decide whether this can be done, for the case does not legitimately present this precise question, and we are averse to expressing an opinion about a matter not properly presente'd by the case. There might be a question of considerable difficulty about parties, but it is neither anticipated nor disposed of. The jury were not instructed respecting the duties of the company under the coal mining act, as was done in the Oarpita Case. This trouble is therefore removed from our present consideration.
The action was brought in the names of the father and the mother, whose relationship was stated, and their right of action based on this fact. The defendant demurred on the general ground of a failure to state facts sufficient to constitute a cause of action, but it did not demur because of a misjoinder of parties plaintiff. This question was sought to be raised by answer. That part of their plea was stricken out on motion, to which an exception was saved. When the plaintiffs started to put in their proof, the defendant objected on the ground of a misjoinder, still insisting that the plaintiffs could not sue jointly. Whether this would be true under the coal mining act we do not decide. The objection to the misjoinder is quite easily disposed of by reference to the code, which requires this question to be raised by de *258 murrer when the misjoinder appears on the face of the complaint, and gives the defendant the right to raise it by answer only in those cases where the complaint fails to show such misjoinder. As we construe the code, where this pleading shows persons are joined who have no right to maintain a joint action, the defendant must demur, and thus save the question ; otherwise he waives it.
The circumstances pertaining to Lamb’s death do not show such contributory negligence on his part as to enable us to say, as a matter of law, that his negligence contributed to the injury. He was probably at work, doing what his duties required, and we are unable to conclude his death resulted from his temporary suspension of work while conversing with Carpita, who was killed at the same time. This question of the negligence of the deceased was submitted to the jury under apt instructions, which correctly stated the law of contributory negligence, so far as it was applicable to the present case, and the finding of the jury concludes this question. There is much more difficulty respecting the instructions covering the question of the duty of the company with respect to the roof. As abstrabt propositions of law, the court’s statements would not be subject to very much criticism, but as applied to the present case, they do not serve to enlighten the jury respecting the duty of the company, and what, as a matter of law, would be negligence on its part in this regard. From the commencement, the case seems to have been tried on an erroneous hypothesis. The complaint, and the evidence offered to support its allegations, confused the general duty of the defendant respecting the care of its mine with its particular duty which it was attempting to discharge when Lamb was killed. The plaintiff was permitted to prove the general condition of the roof antecedent to the accident, and on this evidence the jury were instructed as to the 'Company’s duty to keep the mine in a safe condition for the protection of the workmen. The trouble probably arose from the difficulty of deciding what may be taken as the proximate cause of the injury and those remoter matters *259 which may not be weighed in that connection. There is no subject more difficult of apprehension, either by the lay or the professional mind, than this one of proximate, cause. Many courts, in all manner of cases, have attempted to lay down definitions respecting it since the day when the “ squib was thrown into the market place.” Lamb was not killed because the company had failed, if they did fail, to keep the roof of the entry in a safe condition. The first fall of rock did not kill Lamb. His death resulted from a succeeding fall, which might have been avoided had proper means been used for the purpose. In this the witnesses agreed. There is some dispute respecting the situation of the roof, and it is not made clear whether either end of it rested on the rib, but it is tolerably certain two or three additional props would have averted the disaster. This is not an absolute demonstration from the evidence, but the witnesses all concur in the opinion that the roof could have been adequately supported by props until the final sets of timber were completed and put in place. Manifestly, if this be true, the original negligence did not occasion the injury sued for. There was an absence of an unbroken connection between the alleged negligence of the company in the care and maintenance of the roof, and their want of care in propping it up, which brought about the injury. Milwaukee & St. Paul Ry. Co. v. Kellogg, 94 U. S. 469; Lannen v. The Albany Gas-Light Co., 44 N. Y. 459; Rogers v. Inhabitants of Newport, 62 Me. 101.
It would not serve a useful purpose to cite the numerous cases which are illustrative of this general doctrine. They all agree the defendant is responsible only for the natural and probable consequences of a wrongful act. The judicial labor is always spent in the search for what the learned jurists call “the causa causans,” rather than the “causa sine qua non.” It is especially difficult for the ordinary juryman to disregard what appears to be the causes, however remote, which have some sort of apparent connection with the actual thing which occasioned the injury. When the plaintiff was permitted to prove the antecedent condition of the roof, and *260 the jury concluded, if they did, the company had been negligent respecting its care and maintenance, they would not be very astute to find in the failure to prop the roof while the repairs were being made the real cause of Lamb’s death. This question is fairly saved by the request for instructions, even though prompt and apt objections were not always interposed to the introduction of the testimony. Much of the evidence was admissible in order to show the condition of affairs when the repairs were begun. But the jury should have been directly instructed to disregard the proof respecting the condition of the roof of the entry antecedent to the first fall, in determining the question of negligence and the cause of the injury. The remote and the proximate causes should have been aptly and carefully distinguished, and although, probably, it might have been quite impossible to eliminate the whole difficulty, the law should have been carefully stated to the jury.
Another question fairly presented calls for some additional statement to precede the general discussion of the principle. Robert Allen was the mine boss appointed under the statute. He was a man of many years’ experience, and his competency was not attacked by any of the plaintiffs’ witnesses. It was he who directed the placing of the prop and cap under the roof to support it while they were removing the first fall, and getting the timber sets ready for a permanent support. Lamb had no connection with Carpita, except as a fellow laborer in the mine, engaged in a different employment. He was a driver occupied in hauling coal to the mouth of the pit. He was engaged in the work of removal when the second fall came and killed him. The exact duties of a mine boss, aside from those described by the coal mining act of 1885, are not disclosed. It was not shown that the boss had any control over the men in the mine, other than what must necessarily come to him from the discharge of his statutory duties. Whether he had power to employ or discharge them is not a matter of evidence, nor is his authority either over the mine or over the men established. It must, however, be coincident *261 with the authority given him by the statute. Somewhat more than a general reference must be made to the coal mining act of 1885, for much reliance by way of defense is placed on it by the appellant. It contains many provisions obligatory on the mine owner and the miner. Relative rights and obligations are imposed on each. The mine boss is an individual so designated by the, statute, who must be employed by the mine owner, and put in charge with reference to its safety and its security. He has entire supervision of the whole system of the ventilation of the mine, likewise of its entries, drifts, and rooms, and all machinery and appliances which are used in its operations. He is bound to make his reports regularly to the mine inspector, and is subject to severe penalties for any violation of the act. Of necessity, this would include any failure on his part in the supervision, inspection and care which the statute requires. Miners are likewise given the right to inspect the mine and machinery, either in person or by committee, conjointly with the owner, or otherwise, as they may choose, and to take such steps as their prudence may dictate to secure their own safety and prevent accidents. In another section a right of action is given to certain designated parties in case they sustain damage by reason of any failure to comply with the provisions of the statute, or because of any violation of its requirements. The act is identical in the particulars involved in this suit with the one in force in Pennsylvania, and regulating the operation of coal mines in that state. Manifestly, this question is new to the jurisprudence of the state. There is probably no subject of the law which has been developed with greater learning, illumined by more persuasive arguments, and yet rested on more diversified foundations, than the law of negligence, as applied in actions brought to recover damages for injuries sustained because of the negligence of other persons employed by the common master.
The large and constant increase in the mining, manufacturing and business interests of this and other commercial countries has occasioned a corresponding growth of aggre *262 gated and corporate interests, which, are necessarily intrusted to the various instrumentalities of agency for their management and control. This has brought into peculiar notice, and under a broad and enlarged discussion, the question of • who is a fellow servant for whose negligence the master may not be called on to respond. Many of the elements'which have sometimes been applied to settle this question are in reality but items of evidence, and furnish no reliable guide by which the main inquiry — “ was the master negligent, and is he responsible ?” — can be settled. Where the proof shows the fellow servant to have been in control of the men under him, we cannot logically insist the master shall, under all circumstances, be liable for his negligence, even though it has occasioned the injury. Authority does not dispose of the matter. The inquiry still remains, — was the master negligent?- — and the courts must still ascertain whether the fellow servant occupied such a relation to the master and to his colaborer as that his negligence is to be taken as the negligence of the master. What is known as the Ross Case, in 112 U. S. 877, is one of the most striking illustrations of the cases of this class to be found among the decisions of the best courts of the country. To a good many of the profession it appeared like a departure from the established law, and to amount in fact to a radical modification of the rule respecting fellow servants. Of course, most courts yielded their judgment to that of the very distinguished tribunal which pronounced it, although it became law by the judgment of a bare majority. When this case was cited with approval by the present learned chief justice of our supreme court, in Denver, S. P. & P. R. Co. v. Driscoll, 12 Colo. 520, he very happily chose, as an illustration of the basis on which the Driscoll Case was put, a quotation which is very abundantly sustained by the principle underlying the law, and expressly approved by the later case, which so largely modifies and interprets the Ross Case. It must always be true that wherever the individual whose negligence occasioned the injury to the servant stands in the place of the master, and is *263 in reality his alter ego, his negligence is the negligence of the master, who must answer in damages for the injury which his neglect has occasioned. This view is most elaborately presented in a very able and exhaustive opinion by Justice Brewer in Balt. & Ohio Ry. Co. v. Baugh, 149 U. S. 368. This case has substantially gone back to the doctrine so perfectly expounded in the various opinions expressed in the argument before the House of Lords in Wilson v. Merry, 1 Law Rep. Scotch App. Cases, 326. In the chancellor’s opinion, lie sa}rs the liability does not depend on the question whether the Workman was or was not, in any technical sense, a co-laborer. The true rule must be found in the solution of the question whether there has been negligence on the part of the master in that with reference to which he has contracted with the servant. The Scotch, Case undoubtedly goes farther with respect to the nonliability of the master for the negligence of the fellow servant than the more modern American cases, of which the Baugh Case is a striking example. The fundamental question always remains whether the individual whose negligence has occasioned the injury stands in such relation to the master that his acts can be deemed a breach of the contract which he has made with the servant. This being resolved in favor of the plaintiff, he may recover. We are not unmindful of a very broad distinction between those cases which show negligence in providing a safe place for the servant to work in, and safe machinery for him to use in his labor, and those which concern the general operations of the business in which the workman may be engaged. It has been very generally held the master may not escape liability on proof that the injury came because of the negligence of a fellow servant, who was intrusted with the duty of providing a safe working place for his fellow servant. Hough v. Railway Co., 100 U. S. 213; N. P. Ry. Co. v. Herbert, 116 U. S. 642; Ford v. Fitchburg R. R. Co., 110 Mass. 240 ; Indiana Car Co. v. Parker, 100 Ind. 181; Brazil Block Coal Co. v. Young, 117 Ind. 520.
This exception to the general doctrine-is not based on any *264 distinction which proceeds from the status or the relation which the one servant bears to the other. It rests on the impregnable foundation that since the master is bound to provide a safe place in which the servant may work, whoever may be intrusted with the performance of this duty stands in his place, and, for all practical purposes of responsibility and duty, is the master himself. Consequently his negligence is the master’s negligence, and he may be holden. , As we view this case, it does not come within the exception.
The Pennsylvania cases undoubtedly hold the mining boss to be a fellow servant with the other laborers in the mine. They do not permit any recovery by the injured person where the case shows the injury was occasioned by the negligence of the mine boss. The court rests these cases on the coal mining act, which in Pennsylvania, as in Colorado, has much to do with the duties and responsibilities of mine owners and employees. Lehigh Valley Coal Co. v. Jones, 86 Pa. St. 432; Delaware & Hudson Canal Co. v. Carroll, 89 Pa. St. 374; Reese et al. v. Biddle, 112 Pa. St. 72; Redstone Coke Co. v. Roby, 115 Pa. St. 364.
Thus far the Pennsylvania cases do not infringe the rule respecting the liabilityof a master for the negligence of a fellow servant, because those are cases which grew out of the performance of his work by the fellow servant. It was the manner in which the work was done which occasioned the injury complained of in the Lineoski Case, and in this respect it is analogous to the one at bar. Lineoski v. Susquehanna Coal Co., 167 Pa. St. 153.
There the evidence tended to show there had been a good deal of leakage for some months in the roof of the mine, indicating a large collection of water at some point immediately contiguous to the roof. According to the evidence, the roof was very much disturbed and shaky, and it ultimately fell, flooded the mine, and killed a great many miners. The case tended to show notice of this condition had been given to various persons in charge of the property and the mine boss, but he had neglected to make the repairs which were neces *265 sary to its safety. The court held the mine boss a fellow servant, and that this fact would excuse the company, which was adjudged not liable. The opinion was put on the precise ground of the equality of the workman and the mine boss under the statute, which compelled the appointment of the boss and defined his duties. If we should follow the Pennsylvania decisions, we should be compelled to hold the mine boss, Allen, to be a fellow servant with Carpita and Lamb, and even though the jury might find Allen negligent in the performance of his duty, the company might not be charged. We confess our personal convictions approve this decision. We are unable to see how it is possible to compel a company to employ a mine boss upon whom is laid the responsibility and the duty by statute to attend to the mine and its safety as a place to work in, clothe him with full authority and power in this respect, and subject him to punishments and responsibilities in case of failure, and then hold the master responsible for his acts. He is in no sense the representative of the master, from whom the statute attempts to take entire control of this part of Lis mining operations. The master may supervise him, and he may, so far as maj7 be, direct such changes to be made as his judgment indicates to be necessary; but when the statute put the control of this particular matter into the hands of the boss, and left to his judgment both the question of safety and the means to be used to that end, we are unable to see how he is in any sense, either as vice principal or otherwise, the representative of the master, or how he can stand in any other relation to his colaborer than that of a fellow servant. The evidence is entirely silent with respect to any matters which tend to show'that the mine boss had any powers of control or any authority to emploj7 or discharge, which are so frequently used to determine the question whether the person whose conduct is under investigation is or is not a fellow servant with the one who was injured. There is nothing in the record which discloses his relation to the company to be other than what was derived from his statutory authority. Whether he owed a duty to the com *266 pany, or had any power from it by virtue of the terms of his employment, we are not informed. Under these circumstances, we must conclude he was a fellow servant.
There is another principle which, to our minds, is of great and governing importance in this regard. There is a wide difference between providing a safe place for the servants to work in and putting a place already found to be insecure in condition for the resumption of labor. If it happened to be true the entry was insufficiently timbered and insecure, according to the judgment of the jury, when the first fall occurred, and nobody had been injured, the master must undoubtedly have had the right to put the place in shape for the resumption of labor. He had the right to put an insecure place into a safe condition. Laborers who were employed to aid in this effort took upon themselves whatever of added risk might have come from the then situation of the entry. It is a most undoubted principle that where a piece of property is out of repair, the men who are employed in making it safe take upon themselves whatever of added risk comes from the existing condition of the place or the work. Kennedy v. Spring, 160 Mass. 203; Armour v. Hahn, 111 U. S. 313; Porter v. The Silver Creek & Morris Coal Co., 84 Wis. 418; Carlson v. Oregon Short Line Ry. Co., 21 Ore. 450; Fraser v. Red River Lumber Co., 47 N. W. Rep. 785.
Under these circumstances, it is plain if Lamb was employed to assist in the work of making the roof safe for the miners, he took upon himself the risk which might accrue from the circumstances. With respect to the negligence or the care, the judgment or the imprudence of the mine boss in propping the roof up, he was as to him a coservant, and even though the jury might have been satisfied that the mine boss was negligent and failed to use proper care, the plaintiff could not recover.
A ruling made by the court respecting the introduction of testimony calls for attention. Whether, standing alone, it would be enough to reverse the case, we do not decide; but if is clearly a rule of evidence, and is noted to prevent the *267 recurrence of the error. While the plaintiff was on the stand, he was asked whether, in his opinion, the roof was properly secured at the time the deceased was at work. This was not a case which called for expert .testimony on this subject. The answer of the witness, which was naturally adverse to the company, tended to determine the thing which was the very essence of the action, to wit, the negligence of the company. This was a question for the jury to determine under all the evidence. It was a matter which, when the facts were before them, they could as well decide as the witness himself, and the case was not brought within the rule which permits the opinions of witnesses to be given to the jury in place of the facts on which those opinions must of necessity be based. Denver, S. P. & P. R. Co. v. Wilson et ux., 12 Colo. 20; Spiva v. Osage C. & M. Co., 88 Mo. 68; Lineoski v. Susquehanna Coal Co., 157 Pa. St. 153.
Another matter to which our attention is directed, and on which error is predicated, springs from the proof which the plaintiff offered respecting what he insisted were the possibilities of promotion and advancément for his deceased son. The company promptly objected, but the court permitted the plaintiff to prove the different classes of employés which ordinarily work in a coal mine, and the usual wages which they receive. Such proof is altogether too problematical and uncertain as a basis of damages. There are always possibilities of promotion and advancement for every person. Whether any given person will reap the harvest depends on his personal qualities, his industry, his zeal, and the duration of his life. It is impossible, in the nature of things, for proof to be introduced which shall cover the various elements in the problem. As courts have held in similar cases, all evidence of this description is entirely inadmissible. Richmond & Danville R. R. Co. v. Elliott, 149 U. S. 266.
Only one other matter remains to be considei-ed in order to dispose of all the important propositions which have been suggested, and to guide the lower court in the subsequent trial. This relates to the measure of damages. It will be *268 remembered this is a suit brought by the parents to recover for the injury which they sustained in the loss of a son who had passed his majority. When the suit is conceded to be brought under the general damage act, there can be little doubt of the right of the parents to recover for the pecuniary injury which has been sustained. There is a good deal of difference in the rule adopted in different states respecting this right, and in the limitations which restrict the damages. Wherever statutes of this description are in force, it is almost universally conceded the plaintiff may recover on proof of facts tending to show probable loss because of the death. What proof may suffice in the one case is not always deemed sufficient in another. Houghkirk v. President, etc., D. & H. C. Co., 92 N. Y. 219; Pa. R. R. Co. v. Keller, 67 Pa. St. 300; Richmond v. Railway Co., 87 Mich. 374; Dalton v. The So. Eastern Ry. Co., 4 C. B. N. S. 297; Potter v. Chicago & No. Western R. R. Co., 22 Wis. 615; Birkett v. Knickerbocker Ice Co., 110 N. Y. 504 ; Scheffler v. The Minneapolis & St. Louis Ry. Co., 32 Minn. 518; G. C. & S. F. Ry. Co. v. Compton, 75 Tex. 667; Mollie Gibson Con. M. & M. Co. v. Sharp, 5 Colo. App. 321; Tiffany’s Death by Wrongful Act, secs. 167-172-174.
The difficulty experienced respects the proof offered to show the pecuniary injury. It is not generally laid down that tables recognized as authority by which to settle the expectancy of the lives of the plaintiff and the deceased must be introduced in order to give the data on which to compute the loss, and furnish some basis on which the jury can rest their calculation. It is often slender and generally unsatisfactory. When the age of the respective parties is established, the earnings given, the contributions which have been theretofore made stated, or any proof offered of an existing practice of contribution, enough has been laid before the jury to warrant them in computing, according to their own judgment, the loss which has been suffered. This data was furnished in the present case. The evidence tended to show that the son had contributed his wages to the general fund *269 for the support of the family antecedent to his death, and in other respects the proof was sufficient to furnish a basis on which the jury might legitimately act.
All of the various errors complained of have been considered, and we conclude the case was not properly tried. The judgment must be reversed, and the case remanded for a new trial.

Reversed.