JOHN SHUFELT v. THE FLINT & PERE MARQUETTE RAILROAD COMPANY.

*Railroad companies—Injury at crossing—Contributory negligence.*

1. Railway trains must run where the view is obstructed by cuts, embankments, trees, and other things; and he who does not choose to stop and listen, where he cannot see, must suffer the consequences of his own negligence.
2. The plaintiff's wife is held to have been guilty of such negligence in failing to stop her team, and look and listen for an approaching train, before attempting to cross defendant's track, as to bar a recovery, it appearing that had she done so she could have seen the train when she was at a distance of from 18 to 20 feet from the crossing.

Error to Osceola. (Judkins, J.) Argued February 8 and 9, 1893. Decided July 25, 1893.

Negligence case. Plaintiff brings error. Affirmed. The facts are stated in the opinion.

*Charles A. Withey,* for appellant.

*C. M. Beardsley* and *O. F. Wisner,* for defendant.

GRANT, J. I concur with my Brother MONTGOMERY that there was no negligence in the rate of speed of the defendant's train, or in the piling of the wood along its track. I think the circuit judge was correct in directing a verdict for the defendant.

1. The plaintiff's wife was herself guilty of contributory

negligence. The road was dry and hard. She had two horses, and a lumber wagon with a box, and a spring seat fixed upon the box. She did not stop her team to listen. She had been for a long time familiar with the crossing, and had frequently driven over it. When upon the little rise of ground from 90 to 100 feet from the crossing, she looked to the west, and saw no train approaching. The horses were accustomed to the cars, and were not afraid. They were farm horses. She said she was on a slow walk. She did not stop, and the horses stepped upon the track just as the train struck them. If the woodpile, from the rise of ground to the track, obstructed her view of the approaching train, it was her duty to stop and listen when nearer the track. Had she stopped upon the rise of ground, it is quite probable that she would have heard the train. She testified:

"I did not stand still. My horses were on a walk, and when I got there I pulled on the lines, and came almost to a standstill, and looked, and listened if I could hear the cars, and I did not hear them, so I went along. I was on a slow walk. * * * I did not stop. I drove right onto the crossing. The horses were between the rails when I first saw the train. When I got on the track the train was right there."

She did not listen for any train or signals, from the rise of ground to the track. She evidently assumed that there was no danger of the approach of a train before she could get across. In this she was not in the exercise of common prudence, either for her own safety, or that of those traveling upon the railroad. *Van Auken v. Railway Co.*, *ante*, 307, and authorities there cited.

But, according to the evidence of her own witnesses, when she came within 20 feet of the track she could have seen the train, had she looked. It is no excuse to say that she was looking to the east. The track to the east was in plain view for some distance back from the cross-

ing. The danger, if any, was from the other direction. She could, however, have looked both ways in an instant, and had ample time to stop within 20 feet. While she was walking her team, according to her own testimony, less than 100 feet, the train, which was running at a lawful rate of speed, ran about 80 rods. Passengers upon the highway must be charged with knowledge of the lawful rate of speed at which trains may run, and must govern themselves accordingly. Trains are not limited in the rate of speed they may run in the country, and across the public highways, where the travel is limited. The commerce of the country demands rapid transit. *Robinson v. Railroad Co.*, 79 Mich. 328.

These trains must run where the view is obstructed by cuts, by embankments, by trees, and other things. He who does not choose to stop and listen, where he cannot see, must suffer the consequences of his own negligence. My own views of the duties of travelers upon the highway, in approaching railroad crossings when they cannot see, are fully expressed in *Van Auken v. Railway Co.*, *supra*, and the authorities there cited.

2. The court was, in my judgment, correct in holding that it was conclusively established by the evidence that the statutory signals were given. I deem it proper to refer to the entire testimony in the case on this point, and the circumstances surrounding each witness who has testified thereto, in order that there may be no misapprehension of the facts to which the law is to be applied.

Mrs. Shufelt's testimony amounts simply to this: That, if the signals were given, she did not hear them. The only reason she had for saying that they were not given was because she did not hear them. She was in the midst of the noise made by two horses and a lumber wagon traveling over a hard road, and did not listen from the time she left the rise of ground until she reached the track.

Miles J. McKay was sitting on his horse, 30 or 40 rods south of the crossing, facing west of north, and was watching the train all the time it came around the curve. He was waiting for a man who was coming across a farm near where he stood. His testimony, on direct examination, is: "I did not hear any signal,—whistle or bell." On cross-examination, he said: "I was not paying particular attention to the whistle and bell; had no occasion, that I know of, particularly."

Virgil Wells and his brother were driving with a team about half a mile north of the crossing, saw the train come around the curve, and testified: "We did not hear the train whistle or ring any bell." On cross-examination he said: "I did not hear whistle or bell. They might have sounded. I did not hear them. That is as much as I can say about it."

Cephas Wells was with the last witness at the time. He testified: "I saw the train a minute or two,—a second or two. I did not hear it whistle or ring. We were within hearing distance. I did not notice any indications of a whistle, by a puff of steam or anything. I was watching it as it rounded the curve." Cross-examination: "I wasn't paying attention to see if the whistle or bell sounded. I wasn't interested. All I can say on that subject is, I didn't hear it."

Timothy Fee was a farmer whose house was about 40 rods west of the highway, and 30 rods south of the railroad. He was in his field west of his house, cutting corn. He said: "I did not notice the train when it passed. I did not hear it whistle or ring. It is a general occurrence for trains to pass there every day. I paid no attention to the like. I was within hearing distance, but I did not hear it." Cross-examination: "I paid no attention to the train. I might have seen it, but did not remark it. I can't say I saw it. I don't remember whether I did or not. I won't

swear it did not ring or whistle either. I did not hear it to draw my attention. Trains pass and repass so frequently I pay no attention, unless they whistle to drive stock off."

Justus Berry lived 80 rods north of the crossing. From his house the railroad is visible from the curve to the crossing. He was at work to the west of his house, and saw the train just as it came out of the curve. He said: "I can't say positively whether it whistled or rung, or either. I can always hear them plain, and usually note it; but I can't say, in regard to that special train, whether it did or didn't. I don't remember hearing it. I did when they got down to the crossing. I heard them toot the alarm. I thought it was cattle. They were then behind the woodpile, very close to the crossing, I should judge."

The above is all the evidence on the part of the plaintiff on the subject of signals.

The engineer of the train testified positively that he sounded the whistle for the crossing. The fireman and the conductor also testified that the whistle was blown. The conductor testified that the train was behind time; that he had passengers for Grand Rapids, was anxious to make the connection at Reed City, and was listening for the sound of the whistle. The bell was rung automatically, by air; and the fireman testified it was last started at Chase, seven miles west; that it rung continuously from there till the time of the accident; and that he stopped it after the accident. The engineer also testified that the bell was ringing.

Joseph Finsterwald was at the depot in Reed City, waiting for this train. He testified that while standing upon the platform he heard the crossing whistle; that at the time it whistled he was walking with another man to the west side of the depot to get a cigar; that on hearing the whistle for the crossing he remarked to his companion that they would not have time to get the cigar; that his companion,

who was one of the employés of the depot, replied that they would have time, as the train stopped a few minutes. They got the cigar, and on their return saw the train standing about half a mile up the track.

Nathaniel Clark, a resident of Reed City, was coming towards the south, on this same road, about 80 rods north of the crossing. He heard the crossing whistle,—two whistles. Shortly after that he heard the whistle again. He was then going up a grade in the road, and the crossing was hidden from his view. On reaching the top of the grade, he saw the train backing up. He testified: "I know, by sound, the first whistle I heard was for Walker's crossing. The next would be about at the curve west of the highway. I am positive I heard the whistle, and also heard the bell ring."

Augustus Roberts lived about a hundred rods south of the crossing, Was in his field, sowing grain, and heard a whistle. He said: "It seemed the usual short whistle, and I did not pay any attention to it. It was a locomotive whistle for the crossing." Afterwards, he saw the train backing up.

Samuel Wolfe is a farmer, and has lived in the vicinity 21 years. He was in the smoking car of the train. He testified that he had been noticing the whistles for several crossings west of this one. He heard the whistle for this crossing. He wanted to take the train north at Reed City, and knew that this train was late.

Louis Barrett lived in Reed City. Was approaching the crossing from the depot at the time. He did not see the train until it was standing on the track near the crossing. Was familiar with locomotive whistles. Supposed the crossing whistles to be two whistles,—two long blasts. Heard two whistles, and said it might have been more.

Marcus Laffler was at the depot, waiting for the train. Was standing between the rails. There was quite a crowd

upon the platform. He was facing west, watching for the train. Saw steam escape, and then heard the sound of the whistle, after which the train came down, and stopped about half a mile from the depot. There were one or two blasts of the whistle, and the steam sailed to the south. "I saw one puff of steam, and heard a short blast of the whistle, and there were two or three long puffs of steam, and two or three sounds."

John I. Edwards was waiting at the depot to take the train. Walked to the extreme west end of the station, and stood looking west up the track. Heard the usual whistle for the crossing.

William Hogan lived at Reed City. Was about 30 or 40 rods east of the crossing. Heard the train coming, and saw it. Heard the whistle, and saw the escaping steam from the whistle. The train was just then rounding the curve west of the crossing. It was the crossing whistle. On cross-examination he said that the first whistle was blown around the curve, where he could not see the curve. He went out for the purpose of driving some cows off the track.

John Finkbeiner testified: "Heard the train when it was coming to Reed City. Heard the whistle, but did not know whether it was for the crossing or for the curve."

Fred Kopnick was working in a mill east of the crossing,—the same mill where the two last witnesses were employed. Heard two whistles. Afterwards, he heard another one, and then saw the train backing up.

F. C. McCollum, a physician, was on the train. Had been reading a few days before how they made signals by whistles, and recollected that two toots, followed by two short ones, were the signal for a crossing, and, having nothing else to do coming home, watched all the crossings. He heard two whistles, followed by two short ones, and knew that this was the last crossing before entering Reed

City.   He said: "I am positive the signal whistle I heard
on that train was for that crossing."

George Forest was on the train.   Heard the whistle for
this crossing.   He said it was a regular crossing whistle,—
two long and two short.

Barlow Davis, postmaster at Evart, was at the depot,
standing on the track, when the train came around the
curve.   He remembered very distinctly that it whistled,
and that the whistle he heard was the usual signal for a
crossing.

Of the six witnesses for plaintiff, not one was paying any
attention or listening for the signals.   One did not even
hear the train.   The testimony is purely negative, and of
the weakest character.   We know from common experience
that people usually pay no attention to sounds to which
they are daily accustomed.   All these witnesses lived for
several years in close proximity to this railroad, where these
signals were given many times daily.   Placing this testi-
mony in the strongest light for plaintiff, and it shows only
that these six witnesses were in position where they might
have heard the signals, had they been paying attention and
listening; but they were not, and therefore they cannot tell
whether they were given, as some of them frankly state.
The duty to give these signals is imposed by statute, and
the presumption is that defendant's employés performed it.
It was therefore incumbent upon plaintiff to overcome this
presumption by competent evidence, from which the jury
might justly infer the fact that the duty was disregarded.
Whether, in the absence of any evidence by defendant, a
case was made for submission to the jury, we need not
determine.   Of the 16 witnesses who testified for the
defendant, 6 were upon the train, were paying attention,
and swear positively that the signals were given.   Of the
other .10, 8 swear positively that they heard them, and the
fair inference from the testimony of the other 2 is that the

signals they heard were the regular crossing signals. The danger signals are so different from the crossing signals that one would readily note the difference. To submit the question to the jury, under this evidence, would be equivalent to saying to them that they might base their verdict upon prejudice, and not upon the facts proven. A verdict for the plaintiff, under this evidence, would be a reproach upon the jury that rendered it, and upon the court which permitted it to stand.

This precise question was involved in *Lake Shore & M. S. R. R. Co. v. Miller*, 25 Mich. 274, where the evidence on the part of the plaintiff was substantially the same as in the present case. The charge of the court substantially directed a verdict, and this Court held that if the verdict had been contrary to the instruction the court should have promptly set it aside.

It has also been decided by the court of appeals of New York. *Culhane v. Railroad Co.*, 60 N. Y. 137. It is there said:

"It is proved by the positive oath of the two individuals on the engine, one of whom rang it, and by two others, who witnessed the occurrence, and heard the ringing of the bell. The two witnesses for the plaintiff merely say they did not hear the bell, but they do not say that they listened, or gave heed to the presence or absence of that signal. * * * As against positive, affirmative evidence, by credible witnesses, to the ringing of a bell or the sounding of a whistle, there must be something more than the testimony of one or more that they did not hear it, to authorize the submission of the question to the jury. It must appear that they were looking, watching, and listening for it, that their attention was directed to the fact, so that the evidence will tend, to some extent, to prove the negative. A mere, 'I did not hear,' is entitled to no weight, in the presence of affirmative evidence that the signal was given, and does not create a conflict of evidence, justifying a submission of the question to the jury as one of fact."

*Beauchamp v. Mining Co.*, 50 Mich. 163, is not decisive

of this case. There is ·no similarity in the facts, which are not stated in the opinion. Young Beauchamp was struck by a stone when he was 500 feet from the defendant's mine. No statutory warning was there required. The sole question was not, as in this case, whether the warning was given, but also whether, if given, it was sufficient. There was no stated time for these blasts. The warning was usually given by the cry of "Fire" by the miners. If that warning cry was given, still the question remained for the determination of the jury whether it was sufficient. There was evidence tending to show that the warning was given from two to five minutes before the blast, and while the deceased was in a store a still further distance from the mine, and that when he was struck he was behind an elevation where he could neither see the mine nor be seen by the miners. The writer of this opinion was the circuit judge before whom that case was tried. The issue involved, so far as the notice is concerned, will appear from the following portion of the charge:

"If the defendant cries out from near its mine, 'Fire,' it must go further, and cry out in such a way that any persons within reach of where these stones were liable to be thrown would naturally be expected to hear the warning or alarm so given. As to whether such notice was given, you will take into account the surroundings, the situation, the distance to the road, the place where the boy was hit, and whether there was a hill or elevation between him and the place where these men were at the mine when the signals were given."

The defendant requested the court to charge, not only that the warning cry was given, but that it was sufficient to warn the deceased, who was out of sight, behind an elevation, and these two propositions were united in the same request.

The judgment is affirmed.

LONG, J. I concur in the result reached by my Brother

GRANT, on the ground that the plaintiff's wife should have stopped, and looked and listened, before attempting to cross the track.

HOOKER, C. J.   The plaintiff's wife approached the defendant's railroad, in a lumber wagon, upon a highway. A bank and a woodpile obstructed a view of the track as she approached.   The woodpile commenced about a rod from the highway, and extended 15 rods along and parallel with the track, at a distance of 18 feet therefrom.   From the crossing the railroad could be seen for a distance of 80 rods.   She drove upon a walk, and when her horses' feet were between the rails she saw the train, and tried to turn them off from the track, but was struck by the engine, and injured.

Aside from any other question raised by this record, that of contributory negligence is conclusive.   It was her duty to   look both ways, after getting where she could see, before venturing upon the track, and she should have taken sufficient time to do so, though it became necessary to stop her team for the purpose.   At a point 18 feet from the track, and while yet in a place of safety, she could have seen the train for a quarter of a mile, and the fact that she did not see it until it was close to her is conclusive of the fact of her negligence, in the absence of exculpatory facts.   A person is not justified in driving upon a straight track, in the face of an approaching train, without looking for it, and obstructions to the view, in proximity to the track, increase the obligation of extreme caution.   Many decisions of this and other courts sustain the doctrine, which we will not further notice, in view of the full and repeated discussion of the question to be found in our reports.

The judgment should be affirmed.

MONTGOMERY, J. (*dissenting*).  The plaintiff brought this action to recover damages for injuries occasioned by a collision of the defendant's passenger train with the plaintiff's team, which at the time was being driven by plaintiff's wife.  The declaration avers that the train was running at an unusual rate of speed; that the defendant had caused wood to be piled near the track in such manner as to obscure the view of the train as it was approaching the crossing; and that the engineer of the train, upon approaching the crossing, failed to give the statutory signals by ringing the bell and blowing the whistle.  At the conclusion of the testimony the circuit judge directed a verdict for the defendant, principally upon the ground that the testimony failed to show the negligence complained of.  There was no such unusual rate of speed shown as constituted negligence, nor was the piling of the wood, in the manner in which it was piled, negligence, in and of itself; so that the substantial ground of negligence was the failure to give the crossing signals.

1.  The evidence adduced on the part of the plaintiff was, it is true, in a sense, negative evidence; but we are constrained to hold that it was not so in any such sense as to justify us in holding, as matter of law, that it had no tendency to prove the failure to give the statutory signals.  From the nature of the case, the only way this could be proven by the plaintiff was by offering testimony of those who had an opportunity to hear the signals, and who were in such a position that they must have heard them, if they were in fact given.  Mrs. Shufelt testified as follows:

"*Q*. What do you say as to whether this train whistled or not?

"*A*. I did not hear the train whistle.  It did not whistle.

"*Q*. What do you say as to whether it rang the bell?

"*A*. It did not.  It didn't ring any bell there.  I did not hear it if it did."

Four other witnesses were called, who testified that they did not hear the bell ring or the whistle sound.

The question is whether this testimony, standing by itself, uncontradicted, tended to establish the fact that the defendant omitted this duty. While the testimony offered to contradict this claim was strong, and may have been convincing, yet it will not do to establish, as a rule of law, that testimony which has a tendency to prove a fact may be withdrawn from the consideration of the jury because it is overborne by contradictory testimony. In such case the proper course is to submit the question to the jury, under proper instructions as to the weight of negative testimony, as compared with positive evidence; and if the jury disregard such instructions, or if their verdict is founded rather upon prejudice than a due consideration of the testimony, it becomes the duty of the trial judge to exercise his power to set aside the verdict on this ground. This may be a case in which a result adverse to the defendant upon this ground would call for the exercise of this power. Upon this we are not called upon to express an opinion, but have no doubt that if the occasion arises for the exercise of such power the learned circuit judge will not hesitate to perform his duty in that regard.

The case is very similar to that of *Beauchamp v. Mining Co.*, 50 Mich. 166. It was said in that case:

"There was direct evidence in the case that a warning was given, in the usual and customary manner, before the blast was fired, and witnesses testified that they did not hear any warning, although within hearing distance at the time. Under such circumstances, while we might fairly suppose that a jury would believe testimony of a positive, rather than that of a negative, character, yet so many other considerations enter into the inquiry as to whether a sufficient warning was given or not, that it would be unsafe, as a general rule, for the court to withdraw such a question from the consideration of the jury. The relative positions of the several witnesses; the manner in which they were

engaged at the time; their apparent interest or bias; their appearance upon the stand,—these and other matters require attention and deliberation; and, where the trial judge declines to take the case from the jury, the case should be an exceeding clear one that would justify this Court in finding error. The question whether any—and, if so, a sufficient—notice was given was one of fact, upon which the evidence, though perhaps weak upon one side, was conflicting, thus bringing it clearly within the proper province of the jury to pass upon. If any error was committed by the jury, the remedy is not in this Court, but in the court below, upon a motion for a new trial, or to set aside the verdict." See, also, *Guggenheim v. Railway Co.*, 66 Mich. 156, 159.

The circuit judge apparently relied upon the case of *Lake Shore & M. S. R. R. Co. v. Miller*, 25 Mich. 274. In that case it was said:

"It was also claimed on the trial that the bell of the locomotive of this train was not rung on the approach to the crossing; and, though there was some evidence on the part of the plaintiff tending to show this, most of her witnesses merely saying they did not hear or notice the bell, but some of them stating that it was not rung, the evidence on the part of the defendant was so overwhelming and convincing to the contrary that the judge, in giving the case to the jury, remarked that it seemed to him that, under the evidence, the ringing of the bell could hardly be seriously questioned, but that he left it to the jury, etc. This remark was well warranted, and the evidence was such that, if the specific question had been left to the jury, and they had found the bell was not rung, the court should have promptly set aside the verdict."

In the case last cited the question was not withdrawn from the jury, but was submitted under instructions. It is proper to add that the expression of the circuit judge's opinion as to the weight of this testimony is not in accordance with the rule now obtaining in this State. *Blackwood v. Brown*, 32 Mich. 104; *Chase v. Iron Works*, 55 Id. 139; *Baird v. Randall*, 58 Id. 175.

2. It is contended, however, by the defendant, that, even

if the circuit judge erred in his conclusion upon this question, the plaintiff's wife was, as matter of law, guilty of contributory negligence, and that, therefore, the case should not, in any event, have gone to the jury.

The testimony offered on the part of the plaintiff tended to show that the highway over which Mrs. Shufelt was driving passed through a cut, and that, as she approached the track from the north, the bank, and the woodpile thereon, to the westward, obstructed her view of the track at the point where the train would be when she was opposite the pile of wood. Photographs were introduced in evidence, taken at a distance of 108 feet from the track, and at a distance of 75 feet, respectively. At the first point which she reached when approaching the track, namely, the one distant 108 feet, she had an unobstructed view of the track for a very considerable distance to and beyond the point where the track curved to the left, and it is claimed that she could also see a train approaching the crossing from a point 75 feet distant; and the photograph taken at this point, with the train abreast of the woodpile, makes it apparent that the smokestack and parts of the upper portion of the cars would be discernible. But when she reached this point the train with which the collision occurred must have been at a considerable distance up the track, and the line of vision would be above the top of the cars at the point where they must have been, if on a level with the point opposite the woodpile.

The plaintiff offered testimony tending to show that as the crossing was approached the view of the approaching train would be obscured for a distance of 3 or 4 rods, at least, until within 18 or 20 feet of the track, when the track was clear to view again. Mrs. Shufelt testified as to the care she exercised, as follows:

" Q. When you got on the top of this hill, what did you do to see whether there was a train coming or not?

"*A.* I slacked up my team, and looked.

"*Q.* They were on a walk then, were they not?

"*A.* Yes, sir.

"*Q.* And if you slacked up——

"*A.* I came pretty near to a standstill, to see if I could hear anything of them.

"*Q.* Were you expecting a train?

"*A.* No, sir; I was expecting the train had got to Reed City long before I got to the track.

"*Q.* What did you do?

"*A.* I looked to see if I could see any cars coming.

"*Q.* Looked to the west?

"*A.* I looked to the west, and the east too.

"*Q.* You didn't hear anything?

"*A.* I didn't hear anything.

"*Q.* Or see anything?

"*A.* Or see anything.

"*Q.* What did you do then?

"*A.* I went along.

"*Q.* The team on a walk or trot?

"*A.* On a walk."

She further testified that it was because of the obstruction of the bank and woodpile that she could not see the cars coming; that she heard no signal. And in answer to a question on cross-examination:

"*Q.* From the top of the hill down to the crossing, you were looking west were you not?

"*A.* Yes, I was looking west, and east too.

"*Q.* When looking west, you looked to see if you could see the cars coming?

"*A.* I turned my head first one way and then the other, to see if I could see the cars coming."

She further testified:

"The horses were between the rails when I first saw the train. When I got on the track the train was right there, —right close by."

With this testimony, that she looked carefully at the top of the hill, and that she continued to took to the east and west, before us, we think it is not competent to say, as matter of law, that she was guilty of contributory negligence because she failed to stop in a distance of 18 or 20

feet, where a view of the cars could be obtained. The distance from where she was sitting in her seat, to the heads of the horses, must have been some 10 or 12 feet, so that she could not have traversed to exceed 8 or 10 feet after passing the point where the train was obscured from view. If she was in fact looking in the other direction at this moment, it was not necessarily negligent; and it appears that she did in fact discover the train as early, at least, as the horses reached the first rail of the track, as she pulled the team to the left, and the train striking the horse nearest to the track caused the injury. The fact that she had looked when within a few rods of the track, and when her view was unobstructed; the fact that the train was behind time, so that she had some reason to believe that no train was approaching; and the fact that, according to the testimony of plaintiff's witnesses, no signals were given,—when taken in connection with the testimony of Mrs. Shufelt, that she did in fact look both ways, we think, justified the submission of the question of contributory negligence to the jury. The case is not unlike *Guggenheim v. Railway Co.*, 57 Mich. 488, 66 Id. 150. See, also, *Cooper v. Railway Co.*, 66 Mich. 261, in which case it was said:

"It is a wholesome precaution for persons approaching the track of a railroad to look both ways, and to listen for approaching trains, and it is what is generally required. But it is not a rule of universal application. Every case must depend upon its own circumstances."

See, also, *Richmond v. Railway Co.*, 87 Mich. 374; *Evans v. Railroad Co.*, 88 Id. 442. These latter cases, it is true, were cases in which the traveler was lulled into a sense of security by appearances created by the defendant. But in the present case it appeared that no train was due at the time, and that Mrs. Shufelt had in fact looked up the track before passing the point of obstruction; and to hold that she was negligent, as matter of law, under the circum-

stances of this case, is to hold that she must have kept her
eyes constantly towards the west, to the neglect of a like
duty to note the approach of any train that might be com-
ing from the east.

See, also, the case of *Railway Co. v. Ives*, 144 U. S. 408.
In that case it appeared that for a considerable distance
before the crossing was reached a view of the railroad was
obstructed, so that it was not until a traveler was within
15 or 20 feet of the track that he could get an unobstructed
view of the track to the right.    One witness testified that,
if he was in a buggy, his horse would be within 8 feet
of the track before he could get a good view of it in
both directions.    The deceased was driving along with his
wife, in a buggy.    It appeared that they stopped at some
distance back from the track to listen for any train that
might be passing, and while there a train on one of the
other roads passed by, going out of the city.    They then
drove ahead to the track, and just as they reached the
track, and while apparently watching the train that had
passed, they were struck by one of defendant's trains, com-
ing from the right, at the rate of 20 to 40 miles an hour.
It was held, under the circumstances of that case, that the
question of contributory negligence was for the jury.

In *Greany v. Railroad Co.*, 101 N. Y. 419, it was said
of a case similar to the one under consideration:

"Whether she looked exactly at the right moment, or in
each direction in proper succession, or from the place most
likely to afford information, cannot be determined, as matter
of law; and whether, upon the whole, and in view of all
the surrounding circumstances, including the negligent con-
duct of defendant, she exercised due care, was a question
which the trial court could not properly decide for itself, but
was bound to submit to the jury, as one which they alone
could answer."    See, also, *Kellogg v. Railroad Co.*, 79 N.
Y. 72.

In *McGill v. Railway Co.*, 25 Atl. Rep. 540, negli-

gence of the railroad company was shown, and it was further shown that the deceased stopped, and looked for a train, about 50 feet distant from the track. The court say:

"The only question on the motion for judgment of non-suit was his alleged contributory negligence in not stopping, looking, and listening at a point where he could have had a better view of the approaching train. According to the opinion of some of the witnesses, from the position he occupied at the end of the bridge, he could have seen, over the box-cars, etc., the top of the smokestack of the engine and tops of the passenger coaches. As to that, however, the testimony was somewhat conflicting. It is reasonably certain, however, that he neither heard nor saw the rapidly-approaching train, because it cannot be presumed that he would willfully drive upon the track in front of the train, to his own sure destruction. Conceding, for the sake of argument, that there was some evidence tending to show that the deceased was guilty of contributory negligence in not stopping at a point where he might have had a more unobstructed view, that evidence should have been submitted to the jury, under proper instructions as to the principles of law involved. It was their exclusive province to consider and weigh the testimony, and draw therefrom such conclusions of fact as, in their judgment, were warranted." See, also, *Ellis v. Railroad Co.*, 138 Penn. St. 506; *Newhard v. Railroad Co.*, 19 L. R. A. 563.

The case of *Haas v. Railroad Co.*, 47 Mich. 401, we think, is clearly distinguishable from the present. In that case the deceased, after checking his team for an instant two or three rods from the crossing, went forward on a brisk trot until the heads of his horses came in collision with the engine. In the present case the plaintiff's wife approached the crossing with the team under perfect control, and the only fault, if any, was that she failed, at the very instant when she could have discerned the train to the west, to look in that direction. The jury might have found, if they believed her testimony, that she was directing her attention to the east. This was a question for the jury.

The judgment should be reversed, and a new trial ordered.
McGrath, J., concurred with Montgomery, J.