BOND *v.* LAKE SHORE & MICHIGAN SOUTHERN RAIL-
WAY CO.

1. RAILROADS— ACCIDENT AT CROSSING— CONTRIBUTORY NEGLI-
GENCE.

Plaintiff, who lived a short distance south of a crossing, ap-
proached it from the north, riding in a covered buggy with
closed curtains. She was partially deaf. Before reaching
the crossing she heard the whistle of a train, but, supposing it
to be upon another railroad, drove on without stopping her
horse. While she claimed to have looked through a narrow
·opening at the top of the curtain, and to have been unable to
see the track because of obstructions, she admitted that she
did not keep a constant watch, and failed to controvert in any
positive way the testimony of other witnesses that the ap-
proaching train was visible from the highway for some dis-
tance north of the crossing. *Held* that, upon plaintiff's own
showing, she was guilty of negligence, precluding a recovery
for injuries received from being struck by the train.

2. SAME—CROSSING SIGNALS—EVIDENCE.

The positive testimony of a train crew and a third person,
that the whistle was sounded and the bell rung on approach-
ing a crossing, is not·sufficiently contradicted to justify the
submission of the question to the jury, by the testimony of
the person injured, who was partially deaf, and whose situa-
tion was in other respects unfavorable to hearing such
signals, that she did not hear them, although she was listen-
ing, and the testimony of a boy whose attention was not
directed to the matter, that he did not hear them.

Error to Washtenaw; Kinne, J.    Submitted April 21,
1898.   Decided July 18, 1898.

Case by Hattie M. Bond against the Lake Shore &
Michigan Southern Railway Company for personal in-
juries.    From a judgment for plaintiff, defendant brings
error.    Reversed.

Plaintiff claims that while she was riding south from

Ann Arbor, in a public highway, her carriage was struck by the engine of a freight train going west on the defendant's road.   The accident happened September 22, 1894, and she commenced this action August 19, 1896.   She recovered verdict and judgment.   She was 66 years old, was alone, and driving with one horse and a covered buggy. The curtains were closed.   She claims that she was ignorant of the approach of the train until she heard the alarm whistle and saw the approaching train; that she was then so near the track that she did not dare to stop, and therefore whipped her horse in an attempt to get across.   Her buggy was overturned in a ditch from 20 to 40 feet from the track.   The Ann Arbor Railroad crosses the defendant's road, 2,523½ feet east of the highway, at a place called "Pittsfield Junction."   The highway runs nearly north and south.   The railroad runs southwesterly. A small one-story house and barn, owned by a Mr. Ukle, were situated near the corner, upon the land between the railroad right of way and the highway.   The house was to the south of the barn, and the distance from the house to the track was about 200 feet.

*C. E. Weaver* ( *Geo. C. Greene* and *O. G. Getzen-Danner*, of counsel ), for appellant.

*Lehman Bros. & Stivers*, for appellee.

Grant, C. J. (*after stating the facts*).   1. Plaintiff was guilty of contributory negligence, under her own testimony.   She had lived for 15 years a short distance south of this crossing, and crossed it many times, and was entirely familiar with the situation.   She was partially deaf in her left ear, which was towards the east, the direction from which the train was approaching.   In a written statement, made a few weeks after the accident, she said that she was entirely deaf in that ear.   When plaintiff reached a point near Mr. Ukle's house, she heard a train at the east which she supposed was on the Ann Arbor road.   She knew that a freight train on the de-

fendant's road was due sometime before she reached the crossing. She thought it had gone, but in fact it was behind time. She testified that she slowed the speed of her horse, but did not stop to listen; that she looked through an opening three or four inches wide between the top of the curtain and the covering above; that she leaned forward and looked, and that she listened. She thought there must have been some small trees or something growing on defendant's right of way beside the fence, because she could not see the track.

Plaintiff had no means of determining whether the train she heard was on the defendant's road or the Ann Arbor road. Aside from the fact that a railroad crossing is of itself warning of danger, she was further warned by the noise of a train which might be, and in fact was, on the defendant's road. Travelers upon a highway are charged with notice that trains are liable to pass at any time, and the law requires them to exercise the same degree of care at all times. If it were a fact that trees or bushes obstructed her view, it was her clear duty to stop and listen. It is evident, from her own statement, that she could have heard the train had she done so. On her redirect examination, she testified: "I think I heard the train at the junction start out." In her statement above referred to she said: "When I first heard the train I thought it was on the Toledo & Ann Arbor road, and the next thing I heard was the fearful whistle of the engine." She also said in that statement: "I did not stop to listen or look to see where the train was." She admits that she made the statement, that it was read to her, and that she signed it. There is no evidence of any unfairness in procuring it, or that she was not mentally competent to make and understand it. The only explanation she gives is: "I was very sick, and did not place my mind on it." She denies no part of it, except to say: "I don't think I used the language, 'I didn't stop to listen or look to see where the train was.' I have no recollection of giving him any such statement." The conclusion is irresistible that, had she

stopped and listened, the accident would have been avoided.

It is also conclusively established by the evidence that there was no obstruction to her vision from the time she passed Mr. Ukle's house until she reached the track, and that during that entire distance she could have seen the train from the time it started from Pittsfield Junction. Mr. Walker, who lived in the first house south of the track, was working in a field to the north. He came out into the road with his team about 30 rods north of the track, and saw Mrs. Bond coming 10 or 15 rods behind him. He heard the customary crossing signals, and saw the train. Said he could not help seeing it after passing to the south of Mr. Ukle's house. "From there on to the railroad there was nothing to prevent my seeing it." He testified that plaintiff was sitting on the right side of the buggy, with the curtains up. Other witnesses equally positive corroborate Mr. Walker as to the absence of obstructions to the vision, and there is no testimony to the contrary except the statement of Mrs. Bond. Upon this point her testimony is as follows:

"(*On direct examination.*)

"*Q.* How close to the right of way fence, or Mr. Ukle's land, are there any bushes or shrubbery, or anything of that kind?

"*A.* I think there must have been some. I was not very particular to notice, but I know I could not see through.

"*Q.* State whether or not, when driving along, you tried to look down towards the station.

"*A.* I tried to.

"*Q.* State whether or not there were any small trees or anything growing on defendant's right of way inside the fence.

"*A.* I think there was.

"*Q.* Why do you say that?

"*A.* Because I could not see the track.

"(*On cross-examination.*)

"*Q.* Then you could see down the track?

"*A.* I could not see much until I got on the track. I could not see any train until I got on the track. Could

not tell how far down the track I could see. Could not see to the depot.

"*Q*. What was in the way?

"*A*. Because I was looking; I could not see.

"*Q*. Was there anything in the way between there and the depot?

"*A*. There were things growing beside the road—right of way,—I think, inside the right of way.

"*Q*. What was growing there?

"*A*. I think there were trees and shrubs there, so that I could not see. Did not see anything until the horse was on the track. * * * I don't know as I looked all the while. I looked until I thought there was no train on the road."

We think it is clear that there is no such conflict in this testimony as to justify its submission to the jury.

2. Many allegations of negligence were made in the declaration, but upon the trial all were eliminated except the failure to blow the whistle and ring the bell. Upon this point there was no real conflict in the evidence. The engineer, fireman, one brakeman, the conductor, and Mr. Walker swear positively that the whistle signals were given. The engineer, fireman, and brakeman swear positively that the bell was rung. There is nothing to impeach or weaken this testimony. The only testimony claimed to contradict it is that of the plaintiff herself, and a boy, then 10 years old, as to the whistle, and herself alone as to the ringing of the bell. Plaintiff testified that she "heard no whistle or bell or anything." It is true she testified that she was listening, but it was with at least partial deafness in one ear, with her horse and carriage moving, herself sitting in the carriage, closed on both sides and the back, and the train approaching from the northeast and behind her. She testified on cross-examination:

"*Q*. What was it you heard when you heard the train?

"*A*. I heard the noise it makes when it starts from the station,—the whistle. I don't know what you call it, but the noise it makes when it starts up,—a sharp tooting from the engine."

She further testified: "I could not tell whether the bell was rung or not."

She thus described the usual whistles for the crossing. It is not customary to blow a whistle when starting from a station. The only testimony upon this point was brought out by the cross-examination of the engineer and fireman. The engineer testified:

"I do not recollect whether I sounded the whistle when I left the station. Do not make a practice of it. We ring the bell when we start, and do not use the whistle. That is my invariable practice. Do not think I whistled on this occasion. Did not whistle at all until I whistled for the highway crossing."

The fireman testified that the engineer did not whistle on starting from the junction, and that it is not customary to do so.

When the train started from the junction, the engine stood 15 or 16 car lengths west of the station house. It will thus be seen that there was a very short distance to go before giving the crossing whistle. It was a freight train, and would therefore move slowly at first. It is very evident that the whistle she heard was that for the crossing.

The boy Ukle was at the station house when the train started, and walked after it down the track. He testified that he did not hear the whistle, but "could not tell whether it did whistle or not. I was not paying any attention to know whether it whistled or not." This was not sufficient contradiction of the testimony of the defendant to justify its submission to the jury. *Shufelt* v. *Railroad Co.*, 96 Mich. 327, and authorities there cited; *Urias* v. *Railroad Co.*, 152 Pa. St. 326; *Bohan* v. *Railway Co.*, 61 Wis. 391. Many other cases might be cited holding the same rule.

Judgment reversed, and new trial ordered.

The other Justices concurred.