BECK v. ANN ARBOR RAILROAD CO.

1. RAILROADS—PERSONAL INJURIES—NEGLIGENCE—CONTRIBUTORY NEGLIGENCE—QUESTION FOR JURY.

> Plaintiff, in attempting to cross the tracks of defendant's road, stopped his team within a few feet of the tracks and looked and listened. His view was obstructed by box cars on a side track close to the crossing, and, not hearing an approaching train, drove upon the track and was injured. The train was running at a rate of speed faster than was permitted by ordinance. *Held*, that plaintiff was not, as a matter of law, guilty of contributory negligence, and that the question was properly submitted to the jury. GRANT, J., dissenting.

2. APPEAL AND ERROR—EXCLUSION OF TESTIMONY — ESTOPPEL TO ASSERT ERROR.

> Where, on the trial, counsel offered certain testimony, the admissibility of which was questioned by the court, and it was withdrawn, counsel is estopped to predicate error upon its rejection.

3. TRIAL—ARGUMENT OF COUNSEL—HARMLESS ERROR.

> Where, on the argument to the jury, plaintiff's counsel said: "You will believe what this witness Mortenson said if all the railroad men in Christendom should swear the other way," such statement, while extravagant and disrespectful to defendant's witnesses, will not be presumed to have misled the jury, and does not justify a reversal of the judgment. GRANT, J., dissenting.

Error to Washtenaw; Kinne, J. Submitted October 11, 1907. ( Docket No. 35.) Reargued October 6, 7, 1908. (Docket No. 2.) Decided April 24, 1909.

Case by George A. Beck against the Ann Arbor Railroad Company for personal injuries. There was judgment for plaintiff, and defendant brings error. Affirmed.

*T. W. Whitney*, for appellant.

*A. J. Sawyer & Son*, for appellee.

MONTGOMERY, J. Three questions are presented in this case which deserve consideration: *First,* whether the plaintiff was guilty of contributory negligence, as a matter of law; *second,* whether there was error in excluding the testimony of Mr. F. E. Jones as to measurements which he made after the accident; and, *third,* whether the argument of plaintiff's counsel was so improper as to justify a reversal of the case.

It is unquestioned that there is abundant evidence to show that the plaintiff, when he approached the crossing in question, did stop, look, and listen before attempting to cross. It is the contention of defendant's counsel that the testimony conclusively shows that at the point at which he stopped his view was so obstructed by the cars of the defendant, situated upon the side track between him and the track upon which the approaching train was moving, as to render it impossible to see, and that his observation was therefore futile; and it is claimed that he should have made another and later observation before attempting to cross. The distance from the fence on the west side of Hiscock street to the west rail of the side track is 18 feet; from the west rail of the side track to the west rail of the main track, is 15 feet. The distance from the fence to the west rail of the main track is therefore 33 feet. In Summit street, the street upon which plaintiff was driving when attempting to cross the defendant's track, was a plank crossing, 12, 14, or 16 feet in width, and about the center of the street, and there is testimony on behalf of the plaintiff tending to show that a train of cars extended from this crossing westerly for a considerable distance. Plaintiff came into Summit street from Hiscock street, turning a sharp corner. The testimony as to the location of the northeasterly end of these cars is conflicting. The testimony on the part of the plaintiff would tend to show that they were very close to this plank crossing; one witness testifying that in passing over this crossing and walking on a plank he reached out his hand

and rested it upon the car. The plaintiff testified as follows:

"I saw a string of cars there, did not hear the engine. I drove the horses up there until I got to the north end of the string of cars on a walk.

"*Q.* Did you stop anywhere for the purpose of ascertaining whether there were any cars coming—any train?

"*A.* When I got to where the front feet of the horses would have been on Summit street I saw the condition of the cars, and right across from where I make the turn, there is a flush tank or hole, and there was ice around it, and I saw the condition I had to meet on account of the cars. I had to make an extra turn. I looked both ways, and saw something on the Michigan Central. I turned this corner. I had to cramp the box to get over this plank, It is not over 20 feet. I had to cramp the box to keep away from the flush tank, and get the horses straight across over this plank. The horses were just heading onto Summit street when I stopped them. Before I started to turn when I stopped there, I looked down south and north over those cars as far as I could, both ways. I thought I saw the Central cars north. I don't know as I did. I supposed I saw smoke over in that direction, and thought it was from the cars. I did not see anything south, and did not hear a whistle. I did not hear them ring any bell or make any sound until they struck me. * * * When I turned around the end of the car and straightened out onto Summit street, my horses first struck the plank crossing, where the end of the cars were. The car was on the plank it seems to me. This plank would be 12 or 14 or 16 feet, or something of that kind."

The construction placed upon this testimony by defendant's counsel is that the stop was made at a time when the plaintiff's horses reached the boundary line of Summit street as laid out. A construction quite as reasonable is that it was when the horses were upon the traveled portion of Summit street that they were stopped. The plaintiff says it was when the horses were just heading onto Summit street when he stopped them, but he also says that he had driven up to the north end of the string of cars on a walk. Mr. Begrim, a witness for the plaintiff, was on Summit street across the track from plaintiff. It

is manifest that his view was obstructed until plaintiff had passed the line of the obstructing cars. He testified:

"I just happened to see Mr. Beck come around there with the team and stop there."

On cross-examination he testified:

"The first I saw of Mr. Beck, he came right ahead and stopped his team. Then all at once he came up to the crossing, and no more than got onto the side track when I says, 'There he goes,' and he went up into the air. * * * I saw him just the other side of the track. He was just coming around the corner probably 25 or 30 feet from the track; I am sure I saw him 25 or 30 feet from the crossing, I judge from the main track."

If the testimony of Mr. Begrim is to be accepted, the plaintiff stopped his team after he came within the range of his vision, and, if plaintiff's testimony is accepted, he then made an observation and failed to discover the approaching train, drove onto the track, and received the injuries complained of. I think it should not be said, as a matter of law, that, under these circumstances, he was guilty of contributory negligence.

It is suggested that the case is ruled by *Shufelt* v. *Railroad Co.*, 96 Mich. 327. That case is clearly distinguishable from the present. In that case the plaintiff did not stop her team to listen. She looked when upon a rise of ground 90 to 100 feet from the crossing, and saw no train approaching. She did not stop, and the horses stepped upon the track just as the train struck them. It was said, according to the evidence of her own witnesses, that when she came within 20 feet of the track she could have seen the train had she looked, and stress was laid upon the fact that the speed of the train constituted no negligence. It was said in the prevailing opinion:

"Passengers upon a highway must be charged with knowledge of the lawful rate of speed at which trains may run, and must govern themselves accordingly. Trains are not limited in the rate of speed they may run in the country, and across the public highways, where

the travel is limited. The commerce of the country demands rapid transit."

In the present case, however, it is conceded that the defendant was exceeding the speed limit permitted by the ordinances of the city, and was running its train at the rate of 30 or 40 miles an hour, and, as the jury found, without giving any warning of its approach, whereas the ordinance limits the speed to 6 miles an hour. If passengers are bound to take notice of the lawful rate of speed at which trains may cross a public highway, they are at least authorized to take notice of limits fixed upon the rate of speed within a city, and this certainly would bear upon the question of the point at which the observation of one approaching a crossing may be made, and it has been so held. *Moran* v. *Railway*, 124 Mich. 582. See, also, *Ryan* v. *Railway Co.*, 123 Mich. 597; *Haines* v. *Railway Co.*, 129 Mich. 475; *Deneen* v. *Railway Co.*, 150 Mich. 235; *Detroit, etc., R. Co.* v. *Van Steinburg*, 17 Mich. 99, 118, 119. We think there was sufficient to justify an inference by the jury that the plaintiff was not guilty of contributory negligence. See *Wilbur* v. *Railroad Co.*, 145 Mich. 344; *Corbs* v. *Railroad Co.*, 144 Mich. 73.

As to the second question, namely, whether the court erred in excluding the testimony of F. E. Jones, the record shows that Mr. Jones is a practicing lawyer, and, before he made the measurements at the scene of this accident, he had been retained by the plaintiff's brother, who was the owner of the team of horses killed at the time. When the witness was interrogated as to the measurements made, the court said:

"I don't think you are entitled to that, do you?"

Mr. Whitney, counsel for defendant, answered:

"It is pretty close to the line. * * * I will withdraw the testimony."

We are at a loss to understand why the question should now be presented to urge a reversal of the case.

Mortenson, a witness for the plaintiff, testified that on the morning before the accident occurred he passed from Summit street on the plank crossing, and that, as he crossed over the plank crossing, he put his hand on the end of the box car, thus showing the location of the car to be very near to the plank crossing. The defendant sought to meet this testimony and further testimony on the part of the plaintiff by calling defendant's employés who had taken some measurements later in the day.

In the course of his argument the counsel for plaintiff said:

"You will believe what this witness Mortenson said if all the railroad men in Christendom should swear the other way."

An exception was taken to this statement, and error is assigned upon this portion of the argument. The language of plaintiff's counsel is extravagant. I do not construe it, however, as necessarily intended to imply untruthfulness on the part of railroad men because they were railroad men, but as an extravagant claim for the absolute verity of the testimony of Mortenson. The railroad men with whom Mortenson was being contrasted were beyond question the railroad men who had been sworn in the case, and who were employés of the defendant. It was, in substance, as though counsel had said:

"You will believe Mortenson as against a multitude of interested witnesses such as these."

It is not to be assumed that the jury would be misled by such an extravagant statement, and while the language chosen might have been more respectful to witnesses of the defendant, it was not, in my judgment, such as to justify a reversal of the case on this ground.

The judgment should be affirmed.

BLAIR, C. J., and MOORE and McALVAY, JJ., concurred with MONTGOMERY, J.

HOOKER, J. (*concurring*). It is conclusively shown that the plaintiff had no means of seeing whether a train was approaching while in a place of safety, except by getting out of his wagon and going across the side track. I think it should not be said, as matter of law, that his failure to do this was contributory negligence, for I think we may take judicial notice that few, if any, persons with ordinary hearing are accustomed to do so under similar circumstances. We may perhaps say that it was his duty to stop his team and listen within such a distance of the track as would make it reasonably probable that he would hear the train if one were coming. What that distance should be is a question upon which men would be likely to differ. Manifestly the nearer the track he stopped, the nearer the train would be, and the greater the probability of his hearing it; other things being equal. We may reasonably say that, when he stopped his team, the horses were between 35 and 45 feet from the nearest rail of the main track; and the question, therefore, is: "Can we say, as a legal proposition, that it was negligent to drive that distance upon a walk, and go upon the track without again stopping to listen, in view of the peculiar and unusual situation? He had not far from 70 feet to go to get safely across the main track and out of danger. At 3 miles an hour, this would require about 13 seconds; while in that time a train running 6 miles an hour would run about twice, and at 12 miles four times, the distance, approximately 115 feet, and 230 feet respectively. At faster speed the distance would be correspondingly greater; e. g., at 24 miles 460 feet, and at 48 miles 920 feet. Had this been in the open country where trains commonly run at the latter or a greater speed, I should not hesitate to say that the plaintiff was negligent, but it was not. The law required a speed of not exceeding six miles an hour.

If it could be said, under the proof, that he was justified in acting upon the expectation that the train would not exceed 12 miles an hour—its alleged speed—was it negli-

gent to rely on his ability to hear it 230 feet, and there-
fore to omit stopping again? What would careful, pru-
dent people generally do under such circumstances? I
am not prepared to say that we can take judicial notice
that they would make a nearer stop, nor that they would
not, and therefore I think it was a question for the jury,
and I concur in affirming the case.

OSTRANDER, J., concurred with HOOKER, J.

GRANT, J. (*dissenting*). Plaintiff, while driving his
team of two horses and wagon across the defendant's
main track on Summit street, in the city of Ann Arbor,
was struck by the engine of the regular morning passen-
ger train of the defendant going north. His horses were
killed and himself injured. In this suit he recovered a
substantial verdict for damages which the jury found re-
sulted from the negligence of the defendant.

Defendant's roadbed runs in a valley through the city
of Ann Arbor north and south. At the place of the acci-
dent it had two tracks—a main track, and a side track to
the west of the main track. Summit street comes down
a hill to the west of the track, and crosses it at right
angles going to the main part of the city. It runs sub-
stantially on a level for a short distance from the foot of
the hill to the track. Hiscock street is to the south of
Summit street, and west of the railroad. It also comes
down a hill, and, on approaching the railroad track, it
goes into the valley and runs along the railroad track
north till it joins Summit street. It is graded from the
valley to Summit street. At the junction of Summit
street and Hiscock street is a catch-basin. The street is
narrow at this point. Plaintiff had a coal wagon; the box
being longer than the ordinary wagon box. He had in it
a coal shovel and an iron coal chute. The ground was
frozen hard. A large number of box cars were standing
upon the side track and to the south of Summit street.
Across these tracks was a planking in the center of the
street, between and outside of the rails. This planking

was about 16 feet long. Plaintiff standing in his wagon was 12 to 13 feet from his horses' heads. According to the plaintiff's evidence, the north end of the north car upon the side track was over the planking and near the line of ordinary travel. Under defendant's evidence, the end of the car was some 28 feet from the center of the planking. On the west side of Hiscock street was a fence which terminated at Summit street. Plaintiff drove down Hiscock street over the hill and into the valley on his way to Summit street, and thence into the city. He could not see the approaching train, under his testimony, until he had passed the north end of the north car standing upon the side track. As he approached Summit street, he drove to the fence, so that he might have more room to bring his team and wagon directly across the railroad tracks. This was rendered necessary because of the length of his wagon box and the catch-basin. He testified that, when his horses had reached Summit street, he stopped, stood up in the wagon, and listened. He could not see a train the other side of the box cars. He heard no train. He then drove at a walk into and along Summit street, and, as he passed the box car with his horses' front feet upon the main track, he saw the approaching train about 56 feet away, as he thought. He testified that he could not jump to the right, as there was not room between his wagon and the end of the box car. Seeing that a collision was inevitable, he ran to the rear of his wagon box to get off. The horses were struck near the flanks and killed. They were thrown to the east, and the wagon box was detached by the collision and thrown to the west. The distance from the fence on the west side of Hiscock street to the west rail of the main track is 33 feet. The distance from the west rail of the main track to the west rail of the side track is 15 feet, and from the west rail of the side track to the fence 18 feet. Several persons saw the plaintiff and the train, but were not in position to give him warning in time. They were in position where they could see the train, while, under his testimony, he could not.

1. It is insisted that the plaintiff was, under the undisputed evidence and his own testimony, guilty of contributory negligence, and that the court should, as requested, have directed a verdict for the defendant. This is the important question in the case. Plaintiff could not see the approaching train, and did not see smoke rising from the engine above the box cars. He lived in the vicinity, and his business took him frequently over this crossing. He is chargeable with knowledge that the regular passenger train was about due. He was obliged to turn his team to the west side of the street so as to avoid striking the end of the box car. When his horses had reached Summit street, he stood up in his wagon, looked and listened. He could not see, and did not hear. How far the train at the time he stopped was from the crossing is a matter of conjecture. The ordinance of the city prohibited the blowing of the whistle within the city limits. Of this he must be presumed to have had knowledge. He does not testify that he did not. The noise caused by his horses' feet and the rumbling of the wheels over the frozen ground, the clatter of the shovel and iron chute in the bottom of the wagon, and the box cars standing between him and the main track, should have told him that he probably could not hear an approaching train. Was it his duty to stop again before his horses were upon the track, knowing that he could not see, and again listen, before putting himself into a position in which, under all the authorities, danger was imminent? Had he stopped when his horses stood upon the side track, it is manifest that he would have heard the approaching train. Was it his duty to do so? Did common prudence upon his part dictate this action? His own testimony bearing upon this question is important:

"When I got to where the front feet of the horses would have been on Summit street, I saw the condition of the cars, and right across from where I make the turn there is a flush tank or hole, and there was ice around it, and I saw the condition I had to meet on account of the

cars. I had to make an extra turn. I looked both ways
and saw something on the Michigan Central. I turned
this corner. I had to cramp the box to get over this
plank. It is not over 20 feet. I had to cramp the box to
keep away from the flush tank and get the horses straight
across over this plank. The horses were just heading
onto Summit street when I stopped them. Before I
started to turn when I stopped there, I looked down south
and north over those cars as far as I could both ways. I
thought I saw the Central cars north. I don't know as I
did. I supposed I saw smoke over in that direction, and
thought it was from the cars. I did not see anything
south, and did not hear a whistle. I did not hear them
ring any bell or make any sound until they struck me.
* * * When I turned around the end of the car and
straightened out onto Summit street, my horses first
struck the plank crossing, where the end of the cars were.
The car was on the plank it seemed to me. This plank would
be 12 or 14 or 16 feet, or something of that kind. This
car rubbed against it. * * * I was standing up in my
wagon when I was looking and listening for the train.
The heads of my horses, when I stopped to look both
ways, were just about in line with Summit street, but
they were pulled over to the outside of the road. In or-
der to make this turn, it takes a little more room to turn
with a coal box than with an ordinary wagon as a rule.
When I was driving up there and stopped my horses, I
was as near as I could get to that fence that extends along
the west side of Hiscock street. My horses' heads were
in Summit street. At that time there was nothing in
sight towards the south except those cars. There was no
smoke or steam or any notice of the approach of the train
that I saw; no whistle or ringing of a bell that I saw or
heard. I should judge when I was making the turn the
wheels were just as near the north end of this plank as I
could get and not go off the plank onto the rail, and I
judge the back end of the wagon was near the center.
* * * The horses' front feet had just struck the main
track when I first saw the cars, the crossing on the main
track, and I judge they made another step. I judge from
where they told me they were hit afterwards; from
where they were at this time they must have made an-
other step. I did not stop to see. I could see down the
main track at that time, I should judge, in the neighbor-
hood of 56 feet. It might not have been that far. I

don't know. It might have been closer. I saw it, and I knew that I could not get away, and I dropped the lines. I did not see or hear any flagman or electric bell at that crossing. There was no gate there to keep me from going across."

Plaintiff had no concern with the cars of the Michigan Central railroad. The track of that road was on the opposite side of the city, a long distance away, and he had no occasion to cross it or to look for trains passing over it.

Plaintiff makes no claim that he stopped again before he was struck. Other witnesses saw him, and one or two testified that they saw him stop. The place they saw him stop was evidently the place testified to by plaintiff. The defendant's negligence in leaving the box car standing over a portion of the crossing was before his eyes. He saw it and recognized it. This fact imposed upon him greater vigilance and caution. 2 Thompson on Law of Negligence, § 1670. It is a reasonable rule of law that, when a traveler upon the highway cannot see an approaching train at the crossing, he should stop and listen at that point where the act of stopping and listening will, in all probability, avoid the accident. This is a duty imposed upon a traveler, not only for his own safety, but for the safety of trainmen and passengers. The place of duty is not determined by the distance from, or nearness to, the track, but by the opportunity to listen and thus avoid the danger. The place of opportunity is the place of duty. This is the rule established by *Shufelt* v. *Railroad Co.*, 96 Mich. 327. Suppose plaintiff had been drawing a load of stone or iron, or other hard and bulky substance, the danger of derailment in case of a collision is apparent. It is apparent that the engineer and fireman could not see the exact location of this box car until they were very near the crossing. Plaintiff was in a position to know this. A railroad grade crossing on the public highway is not only notice of danger, but is also notice that that danger may come at any moment. Plaintiff could not see an approaching train until it was almost upon him, and the jury by

their verdict have established this fact. When he did see the engine, it was too late to avoid the collision, for his horses were then in the path of the approaching train. It is true that the defendant was running its train at a speed prohibited by the ordinance of the city, limiting the speed to six miles an hour, and it is conceded that this speed—twelve miles an hour—was negligence. But this did not justify the plaintiff in acting upon the presumption that the railroad company's employés would conform strictly to the requirements of the law. The language used in *Lau* v. *Railway Co.*, 120 Mich. 115, is applicable here:

" Is it not common prudence for one, in entering a dangerous place, to take that course which involves no inconvenience, delay, or trouble to himself, and which will, if followed, insure his own safety as well as that of others? If it is, the law requires him to take it.   *   *   *   Engineers and firemen do not always perform the duties imposed upon them in giving the signals. While the presumption may be that they do, human nature is not yet so perfect that every one performs his duty. To sustain the plaintiff's right of action would be to hold that he has the right to rely absolutely upon the presumption of this duty by the trainmen, and that he may ride along regardless of consequences and rely upon the absolute performance of this statutory duty."

The street in that case was obstructed the same as it was in this. If it was the duty of the plaintiff in that case to alight from his bicycle just before he approached the track, and look and listen, and thus avoid the danger, why was it not the duty of the plaintiff in this case to stop his team when within 10 or 15 feet of the track, and again listen ? To have done this would have no more delayed or inconvenienced him than would Mr. Lau have been delayed or inconvenienced by alighting from his bicycle. This single act of care would have avoided the accident in both cases.

I think this case is ruled by *Shufelt* v. *Railroad Co.*, 96 Mich. 327. The facts in that case are very similar to those in this. Mrs. Shufelt drove from 90 to 100 feet

without stopping to listen, and did not see or hear the train until the horses were upon the rails. We there said:

"The road was dry and hard. She had two horses, and a lumber wagon with a box, and a spring seat fixed upon the box. She did not stop her team to listen. She had been for a long time familiar with the crossing, and had frequently driven over it. When upon the little rise of ground from 90 to 100 feet from the crossing, she looked to the west, and saw no train approaching. The horses were accustomed to the cars, and were not afraid. They were farm horses. She said she was on a slow walk. She did not stop, and the horses stepped upon the track just as the train struck them. If the woodpile, from the rise of the ground to the track, obstructed her view of the approaching train, it was her duty to stop and listen when nearer the track. Had she stopped upon the rise of ground, it is quite probable that she would have heard the train. She testified:

"'I did not stand still. My horses were on a walk, and, when I got there, I pulled on the lines, and came almost to a standstill, and looked and listened if I could hear the cars, and I did not hear them, so I went along. I was on a slow walk. * * * I did not stop. I drove right onto the crossing. The horses were between the rails when I first saw the train. When I got on the track, the train was right there.'

"She did not listen for any train or signals from the rise of the ground to the track. She evidently assumed that there was no danger of the approach of a train before she could get across. In this she was not in the exercise of common prudence, either for her own safety or that of those traveling upon the railroad."

Thompson (2 Thompson on Law of Negligence, § 1656) states the rule thus:

"It is perfectly plain that if the traveler looks at a place from which he cannot see, or listens from a place from which he cannot hear, and there are other places from which he can see or hear, or both see and hear, and he does not avail himself of those places, to the end of ascertaining whether or not a train is approaching—he has not discharged the duty of exercising ordinary or reasonable care which the law puts upon him."

See, also, *Scott* v. *Railway Co.*, 79 Ark. 137 (9 Am. & Eng. Ann. Cas. 212, and note). If, under the case made by the plaintiff, reasonable minds might draw different conclusions, some that he exercised vigilance and caution, and others that he did not, then the case was properly left to the jury. If, however, under the case made, it was the clear duty of the plaintiff to stop and listen before entering upon this dangerous place where he was deprived of all ability to see, the defendant was entitled to the direction of a verdict in its favor. I think the duty to so stop and listen again is clear. Grade crossings are allowed in this country. The duty of railroad companies and travelers upon the highways to use all reasonable vigilance and caution to avoid collisions is mutual. The failure upon the part of either to use such reasonable vigilance and caution does not excuse the other. When both are negligent, both must suffer the consequences which result.

Under this record the court should have directed a verdict for the defendant.

2. Inasmuch as a new trial is ordered, one other question must be determined. A witness named Mortenson testified for the plaintiff that the north end of the north box car extended over the plank crossing. There was testimony on the part of the defendant in direct contradiction of this testimony. In arguing the case to the jury, the learned counsel for the plaintiff in the heat of argument said:

"You will believe what this witness Mortensen said if all the railroad men in Christendom should swear the other way."

Defendant's counsel excepted to this statement, and thereupon plaintiff's counsel said:

"I will allow my brother on the other side all the ingenuity he can use."

The location of this car became a most material question of fact. If it was located at the distance from the crossing testified to by the defendant's witnesses, the

plaintiff was beyond doubt guilty of contributory negligence. His right to recover depended entirely upon the determination of the location of this car. The statement of counsel virtually said to the jury:

"Railroad employés, when testifying in behalf of their employer, are not worthy of belief, when a witness for the plaintiff and witnesses for the employer are in direct conflict."

It charges in no uncertain words that the testimony of railroad employés should be discredited, not because they are employed by a party to a suit, but because they are employed by a railroad company. It suggests that a different rule is to be applied in testing the credibility of employés of railroad companies from that applied in testing the credibility of the employés of other parties. It suggests that employés of railroad companies are peculiarly untrustworthy as witnesses. We may say, as we said of a similar remark in *Dolph* v. *Railway Co.*, 149 Mich. 278:

"Here is clearly an appeal to the prejudice of the jury. They are asked, in effect, to discredit defendant's witnesses because defendant is a railroad company. It is as if counsel said: 'Don't give railroad companies a fair trial because they are railroad companies.' I think every one will concede the injustice of such arguments. It is clearly our duty to condemn them, and protect litigants from their injurious consequences."

While we dislike to reverse cases for intemperate language, we cannot avoid the responsibility when language is used which clearly tends to prejudice the jury. If counsel was provoked by any action or language on the part of defendant's counsel into making these statements, the record fails to show it.

Judgment should be reversed, and new trial ordered.